**NATIONAL COUNCIL OF COMMUNITY MENTAL HEALTH CENTERS, INC., et al., on behalf of themselves and others similarly situated, Plaintiffs,**

v.

**Caspar WEINBERGER et al., Defendants.**

**Civ. A. No. 1223–73.**

United States District Court, District of Columbia.

Aug. 3, 1973.

Jerome S. Wagshal, Pearce & Wagshal, Washington, D. C., for plaintiffs.

Kenneth A. Rutherford, Atty., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

Plaintiffs as a class bring this action seeking an order requiring defendants to review, approve, and obligate to the plaintiffs funds in the amount of $52,050,000 for first-year grants for staffing of community mental health centers and for construction and staffing of mental health treatment centers for children under the Community Mental Health Centers Act, as amended, 42 U.S.C. §§ 2688–2688d, 2688u (hereinafter referred to as the Act). The class, certified by the Court under Rule 23, Fed.R.Civ.P., consists of all those having applied for first-year grants under these provisions of the Act.

Defendants have moved to dismiss this action on the grounds that the Court lacks jurisdiction over the subject matter of this action; that plaintiffs have failed to join an indispensible party; that there is no justiciable case or controversy presented by this action; and that the complaint fails to state a claim upon which relief can be granted. In addition, plaintiffs and defendants have each cross-moved for summary judgment as a matter of law. The issues have been thoroughly briefed and the underlying facts are not in dispute.

Administration of the Act lies with the Secretary of the Department of Health, Education and Welfare (HEW). The Regional Offices of HEW review applications and then send them to the National Advisory Mental Health Council for approval. If that approval is obtained, each of the ten HEW Regional Directors then makes the final determination on which of the applications as recommended favorably by the National Advisory Mental Health Council will be finally approved for award, the amount to be awarded, and the priority order for payment. Accordingly, although a Regional Health Director may not award a grant that has not been recommended for approval by the National Advisory Mental Health Council, a favorable recommendation by the National Advisory Mental Health Council neither constitutes effective approval of a grant application nor obligates the respective Regional Health Directors to award a grant to the applicant.

On February 23, 1973, the Director of the National Institute of Mental Health issued a directive to the HEW Associate Regional Directors for Mental Health which in pertinent part:

(1) Noted that because of the revised 1973 budget "no new staffing grants will be awarded in 1973."

(2) Noted that "[a]ll activities of the Regional Offices pertaining to the development of additional staffing grant applications should be discontinued since they cannot be funded."

(3) Discouraged potential applicants for grants from making application: assistance in the form of "staffing application kits" was directed "not [to] be distributed to potential applicants;" applications received and not yet reviewed were not to be "site visited or reviewed for funding but should be acknowledged to the applicant in a letter explaining the reason the application will not be reviewed . . . ;" staffing grant applications already reviewed by the Regional Office were ordered "not [to] be duplicated or presented to the National Advisory Mental Health Council."

As of February, 1973, a total of 77 grant applications had been recommended for approval by the National Advisory Mental Health Council, in total sum of $39,026,565, and many other applications had been received and were under review, or had been initially approved by Regional Directors. After February 23, 1973, defendants ceased

procuring and developing first-year grant applications by members of the plaintiff class and applications have not been processed or developed. No action was taken by defendants after February 23, 1973, to obligate or expend funds for the 77 approved grant applications, or for any other first-year grant applications in fiscal 1973, although the defendants made available funds in fiscal 1973 to applicants to meet the continuation costs of previously funded grants.

By continuing resolution, for fiscal year 1973 Congress has appropriated for obligation and expenditure the sums of $165,000,000 for Community Mental Health Center staffing and $20,000,000 for Mental Health for Children.[1] Although approximately $52,050,000 of this appropriation is available for funding first-year grant applications, none of this amount had been obligated or expended as of the date of suit. On June 28, 1973, the Court entered a preliminary injunction ordering defendants to review and fully process by normal criteria all pending applications, and to take measures necessary under 31 U.S.C. § 200 to prevent all unobligated and unspent funds for the first-year grant programs from lapsing at the end of fiscal 1973, and thus returning to the general treasury fund pursuant to 31 U.S.C. § 701(a)(2).

Before turning to the merits, the issues raised by defendants' motion to dismiss must be considered.

The defendant Government officials raise standard objections so typical in these cases and many other categories of current Government litigation. They plead sovereign immunity and say that citizens directly affected as potential beneficiaries of appropriations have no standing to complain because these appropriation matters raise transcendent political issues which a Federal Court should not venture to resolve.

■ It is time this litany was displaced by a modicum of common sense. When Congress directs that money be spent and the President, as Chief Executive, declines to permit the spending, the resulting conflict is not political. The President, after being advised, believes he has the power because of economic conditions and other reasons to refuse to spend at his discretion. Yet he is charged by the Constitution faithfully to execute the laws. If the President is in all good faith mistaken as to the meaning and effect of the law or his inherent power under the Constitution, what is more normal and consistent with our American system of government than for the courts to interpret the law and thus resolve the apparent conflict one way or the other.

■■ This dispute can readily be resolved by the customary exercise of judicial power, and therefore is not a nonjusticiable political question. Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Furthermore, any affirmative order of this Court would be premised on a determination that official action by the defendants in refusing to spend is beyond their statutory or constitutional powers. This would go no further than to require the spending of funds already appropriated by Congress to achieve the declared purposes of the Act. Accordingly, there can be no effective assertion of sovereign immunity and the defendants' actions are reviewable by the courts. See Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). The Court has jurisdiction pursuant to 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331 and 1361.

■ An issue of statutory interpretation and constitutional construction is presented. To say that the Constitution forecloses judicial scrutiny in these cir-

---

1. 86 Stat. 402 (1972), as amended, 86 Stat. 563, 746, 1204 (1972) and 87 Stat. 7 (1973); H.R. 15417, 92d Cong., 2d Sess. (passed June 15, 1972).

cumstances is to urge that the Executive alone can decide what is best and what the law requires. To say that persons immediately and seriously affected by failure to commit funds authorized by the Legislature cannot go to court is to ignore the democratic base of our society. Indeed, it is only when the three equal and coordinate branches of government function that a stable government can be assured. *Cf.* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). The rule of law dictates calm judicial determination rather than political confrontation. Such confrontations are either resolved by naked power utilized in many irrelevant ways, or the issue stalemates. We are a government of law, not men, and the law must be determined and upheld. This is the never-ending process by which the Constitution is molded to the exigencies of the times and will be made rational in this and succeeding centuries. These cases should move to higher courts for prompt, definitive determination shorn of the confusing inconsequential defenses so typical of Government legalese these days. The defendants' motion to dismiss is denied.

The controlling question on the merits is whether the money authorized under the legislation was appropriated to be spent at the discretion of the Executive, or appropriated with an affirmative direction that the money be fully spent within the fiscal year. This issue is to be resolved without regard for the merits or demerits of the particular program involved, although it is perhaps of some significance in weighing the matter to note that this particular appropriation does not affect our foreign or military affairs. Rather, it falls squarely in an area of domestic concern in which the President's responsibility to execute the laws must be viewed without regard to issues of national defense or foreign policy, where the Constitution may recognize some special authority of the President to deal with developing conditions.

[5] The defendants emphasize the overall economic problems confronting the nation, the heavy demand for funds in areas where national security considerations abound, and the absence of any national procedure for reconciling various appropriations in the light of current budgetary pressures, in part exacerbated by debt limitations. All of this is indeed pertinent, but whatever may be the President's power to limit expenditures to accommodate the total moneys available, he does not have complete discretion to pick and choose between programs when some are made mandatory by conscious, deliberate congressional action. At least with respect to the programs involved here, there is no basis for defendants' assertion of inherent constitutional power in the Executive to decline to spend in the face of a clear statutory intent and directive to do so. Kendall v. United States ex rel. Stokes, 37 U.S. 524, 9 L.Ed. 1181 (1838); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); State Highway Comm'n v. Volpe, 479 F.2d 1099 (8th Cir. 1973); Local 2677, Am. Fed'n Gov't Employees v. Phillips, 358 F.Supp. 60 (D.D.C. 1973).

■ The Court concludes that Congress intended to require a full commitment of the fiscal 1973 appropriated funds by the end of the fiscal year. This intent is established by the following facts and circumstances, among others.

Through the Act, Congress has constructed an elaborate scheme to advance the cause of community mental health treatment, and has continually appropriated money to achieve the purposes of the Act. The object of the Act is to provide federal money to establish new community mental health centers and programs throughout the nation. Once begun, the federal moneys continue to be available in succeeding years at somewhat reduced levels. In extending the program to make available initial grants in additional fiscal years, Congress has necessarily also permitted additional centers to be eligible for the substantial succeeding year grants. In the face of vast unmet mental health needs through-

out the nation, Congress has continuously appropriated money for new grants to extend the benefits of the Act. The Act was never viewed by Congress as a demonstration program to get communities to follow the examples of others and start their own centers, but rather a national effort to redress the presently wholly inadequate measures being taken to meet increasing mental health treatment needs.[2]

The defendants' present efforts to shut down these programs, perhaps in favor of others, on the grounds these initial general funding grants were for demonstration programs and have served their purpose, is not only inconsistent with the Act, its continuing support and expansion by Congress, and the congressional intent found in the legislative history, but is a view recently explicitly rejected by Congress in extending the programs, with appropriations, through fiscal 1974, so that community facilities can be further expanded.[3] Therefore, while the internal language of this Act is "discretionary," it would appear Congress did not intend that the Executive shall have discretion simply to end the program in total without regard to the essential purposes of the Act. *See* State Highway Comm'n v. Volpe, *supra*.

Given this intent, the question then arises whether this intent was anywhere made sufficiently explicit by the statutes as to constitute a mandatory directive to the President. Subsequent to the passage of the Act, an amendment (hereinafter "Section 601") was enacted which provided as follows:

> Notwithstanding any other provision of law, unless enacted after the enactment of this Act expressly in limitation of the provisions of this section, funds appropriated for any fiscal year ending prior to July 1, 1973, to carry out any program for which appropriations are authorized by . . . or the Mental Retardation Facilities and Community Mental Health Centers Construction Act of 1963 (Public Law 88–164, as amended) *shall remain available for obligation and expenditure until the end of such fiscal year*. Medical Facilities Construction and Modernization Amendments of 1970, Pub.L.No. 91–296; Title VI, § 601, 84 Stat. 353, 42 U.S.C.A. §§ 201 note and 2661 note (emphasis added).

While the meaning of the language "shall remain available for obligation and expenditure until the end of such fiscal year" is not readily apparent on its face nor free from doubt, read in the light of the legislative history of Section 601 and the meaning commonly given and accepted for such language,[4] the Court must conclude that this provision makes mandatory the spending of funds appropriated under the Act for fiscal 1973.

Before initial passage by Congress, the Executive recognized that all other statutory provisions notwithstanding, Section 601 converted "HEW health-re-

2. *See, e. g.*, S.Rep.No.92–1064, 92d Cong., 2d Sess. 38–49 (1972) ; S.Rep.No.91–583, 91st Cong., 1st Sess. (1969) ; H.R.Rep. No.91–735, 91st Cong., 1st Sess. (1969) ; S.Rep.No.294, 90th Cong., 1st Sess. (1967) ; H.R.Rep.No.212, 90th Cong., 1st Sess. (1967), U.S.Code Cong. & Admin. News 1967, p. 1252 ; S.Rep.No.366, 89th Cong., 1st Sess. (1965) ; H.R.Rep.No. 248, 89th Cong., 1st Sess. (1965), U.S. Code Cong. & Admin.News 1965, p. 2401 ; S.Rep.No.180, 88th Cong., 1st Sess. (1963) ; H.R.Rep.No.694, 88th Cong., 1st Sess. (1963), U.S.Code Cong. & Admin. News 1963, p. 1054.

3. Health Programs Extension Act of 1973, Pub.L.No. 93–45, §§ 203 and 207, 87

Stat. 94 (June 18, 1973) ; 87 Stat. 130 (1973) ; H.R.Rep.No.93–227, 93d Cong., 1st Sess. 10 (1973).

4. Language like that used in Section 601 has previously been used by Congress with the intent to make mandatory the spending of appropriated funds. Such an intent of similar language has been recognized by the Executive, and the courts have so interpreted it. See 20 U.S.C. § 1226 and 23 U.S.C. § 118(a) ; S.Rep.No. 91–634, 91st Cong., 2d Sess. 78–79 (1970) ; 114 Cong.Rec. 29014–16 (1968) (remarks of Senators Morse and Yarborough) ; State Highway Comm'n v. Volpe, *supra*.

lated programs into mandates to spend regardless of considerations of common-sense economy and prudent use of the taxpayers' money." Letter from Robert P. Mayo, Director, Bureau of the Budget, to Rep. Harley D. Staggers, May 11, 1970. This section was originally a Senate amendment and its mandatory nature was agreed to by the House conferees only after it was limited to funds for fiscal years through 1973 and to the three health programs with the greatest needs. Moreover, the floor debates and committee reports reflect a clear understanding that Section 601 made spending mandatory "to prevent administration imposed freezes, reductions and roll-backs from applying to health programs." H.R.Rep.No.91–1167, 91st Cong., 2d Sess. 25–26 (1970). See 116 Cong.Rec. 22266, 22267, 22268, 22271–73 (1970) (remarks by Senators Yarborough, Dominick, Javits and Kennedy). The President vetoed Section 601 principally because Congress was insisting that fiscal 1973 funds "to carry out the programs involved must be spent." 116 Cong.Rec. 20876 (1970) (Veto Message of President Nixon). With this meaning clearly in mind, Congress overrode the President's veto. Finally, with this legislative background and the current debate over Executive spending well in mind, Section 601 has recently been extended through fiscal 1974. The Health Programs Extension Act of 1973, Pub. L.No.93–45, § 401(a), 87 Stat. 95 (June 18, 1973). In so doing, the committee reports make explicitly clear that the language in question here requires the expenditure of funds. H.R.Rep.No.93–227, 93d Cong., 1st Sess. 10 and 15 (1973).

Money has been appropriated to achieve the purposes of the Act and the defendants are given the non-discretionary statutory duty to spend those funds for grants that meet the pre-February 23, 1973, lawful criteria embodied in rules and regulations promulgated to achieve the purposes of the Act. The defendants have no residual constitutional authority to refuse to spend the money. Accordingly, the plaintiffs' motion for summary judgment is granted and the motion of defendants for summary judgment is denied. An appropriate Final Order accompanies this Memorandum Opinion.

As to the question of relief, the Court must address one point pressed by plaintiffs. Because the Act, Section 601, and supporting appropriations have in effect been carried over to fiscal year 1974 (87 Stat. 94 and 95, §§ 203, 207, 401(a) (1973), and 87 Stat. 130 (1973)), plaintiffs seek relief applicable to fiscal year 1974 as well as 1973. The Court must decline such relief. There is no controversy as to fiscal 1974 before the Court and ripe for determination. Congress has various proposals under consideration which may affect this controversy, and the Executive has substantial time in which to formulate a position on expenditure of 1974 funds before new applicants would face injury. If and when such injury is real, those aggrieved can proceed by a separate action.