WEST SIDE ORGANIZATION HEALTH SERVICES CORPORATION *et al.*, Plaintiffs-Appellants, *v.* JAMES THOMPSON, Governor, *et al.*, Defendants-Appellees.

First District (4th Division)    No. 77-1386

Opinion filed May 31, 1979.

Ronald Barliant and James A. Carney, both of Devoe, Shadur & Krupp, of Chicago, for appellants.

William J. Scott, Attorney General, of Chicago (Karen Konieczny, Assistant Attorney General, of counsel), for appellees.

Mr. JUSTICE LINN delivered the opinion of the court:

Plaintiffs, West Side Organization Health Services Corporation (WSO), John Doe, Joseph Doe and the Honorable John D'Arco, brought this action in the circuit court of Cook County on behalf of operators of drug abuse treatment programs, certain drug addicts and resident-taxpayers, to prevent officials of the executive branch of the state government from withholding funds appropriated by the General Assembly for the use of the Dangerous Drugs Commission. The circuit court granted the State defendants' motion to dismiss the action and the plaintiffs appeal.

The issues presented on appeal are: (1) whether the lapse of the funds

in question into the General Revenue Fund renders the appeal moot; (2) whether the named plaintiffs have standing to maintain this action; (3) whether the principle of separation of powers bars judicial review of the executive branch's conduct; (4) whether the action is barred by the doctrine of sovereign immunity; and (5) whether plaintiffs' amended complaint states a cause of action.

We reverse and remand.

The Dangerous Drugs Commission (DDC), created by the Dangerous Drug Abuse Act (Ill. Rev. Stat. 1977, ch. 91½, par. 120.1 *et seq.*), is charged with the responsibility of administering drug abuse treatment programs in Illinois. Under the Act, the DDC is empowered "[t]o make such agreements, grants-in-aid and purchase-care arrangements with * * * any public or private agency * * * as are appropriate to effectuate the purposes of this Act." Ill. Rev. Stat. 1977, ch. 91½, par. 120.5—6.

Plaintiff WSO is an Illinois not-for-profit corporation which operates a drug rehabilitation program in Chicago and provides drug abuse treatment services. The State of Illinois, through the DDC, contracts to purchase drug rehabilitation services from WSO. Plaintiff John Doe is the fictitious name of a real person who is addicted to drugs and who has participated in the WSO drug rehabilitation program. Plaintiff Joseph Doe is the fictitious name of a real person who was allegedly denied participation in the WSO's drug rehabilitation program because of reduced state funding. Plaintiff John D'Arco is an Illinois citizen and taxpayer and member of the Illinois State Senate who claims an interest in maintaining State funding for drug rehabilitation programs.

All defendants are sued in their official capacities as State officials including Governor James Thompson, the director of the Illinois Bureau of the Budget, and the director and members of the DDC. In addition, the acting director of the Illinois Department of Finance (currently the Department of Administrative Services), the Illinois State Comptroller and the Illinois State Treasurer are named as defendants for their responsibility in the handling and distribution of public funds to drug treatment programs.

Appropriations of State monies for the purchase of drug treatment services are made by the General Assembly. The State Treasurer holds public funds for disbursement upon warrants issued by the State Comptroller. (Ill. Const. 1970, art. V, §§17 and 18.) The Comptroller issues warrants for payment of DDC expenses on the basis of vouchers certified by the director of the DDC and approved by the Department of Administrative Services. (Ill. Rev. Stat. 1977, ch. 127, par. 146.) The Department of Administrative Services does not approve vouchers unless they conform with allotment request forms approved by the Bureau of the Budget, a branch of the Governor's office statutorily empowered to

assist the Governor in planning the State budget. Ill. Rev. Stat. 1977, ch. 127, par. 412.

Plaintiffs' five-count amended complaint alleged that in 1976, the Illinois General Assembly passed an appropriations bill that included a line item in the amount of $3,545,000 to be used by the DDC in fiscal year 1977 for the purchase of drug abuse treatment services. Governor Daniel Walker exercised his veto powers to reduce that line item by $100,000 to a total of $3,445,000. In December of 1976, the General Assembly overrode the Governor's veto reduction and the original appropriation of $3,545,000 became law. (1976 Ill. Laws 337-43.) Thereafter, Governor Thompson, through his agent, the Bureau of the Budget, informed the DDC that no allotment for the purchase of drug abuse treatment services in excess of $3,445,000 would be approved. The $100,000 amount restored to the appropriation by the General Assembly was reserved by the Governor for State budgetary reasons.

The amended complaint further alleged that while the appropriations bill was still pending in the legislature, DDC informed WSO that it planned to allocate $430,948 of the $3,545,000 appropriation for the purchase of drug treatment services from WSO. The DDC then reduced the allocation for WSO services to $330,948 after being informed by the Bureau of the Budget that no allocation in excess of a total of $3,445,000 would be approved for disbursement. WSO entered into a service contract with DDC, effective July 13, 1976, for the reduced amount. The amended complaint alleged that but for the reservation of the $100,000 for budgetary reasons, the additional funds would have been spent by DDC to obtain drug treatment services from WSO and similar organizations.

Plaintiffs sought writs of mandamus and prohibition and declaratory and injunctive relief to prevent the Governor and his agents from interfering with the DDC's allotment and expenditure of funds appropriated by the General Assembly for DDC use, and to compel the DDC to expend the funds on the purchase of drug treatment services. The trial court denied a motion by plaintiffs for temporary relief to segregate the $100,000 in question and prevent the expiration of the appropriation on June 30, 1977. A similar motion was denied by this court on October 4, 1977.

Defendants moved to dismiss the complaint, asserting, *inter alia*, that the claim was barred by the doctrines of separation of powers and sovereign immunity, that the named plaintiffs lacked standing to maintain the action and that the amended complaint failed to state a cause of action. On September 13, 1977, the trial court granted defendants' motion to dismiss and adopted the defendants' memorandum in support of their motion to dismiss as the basis for its decision. It is from this order that plaintiffs appeal.

In this court, defendants filed a motion to dismiss the appeal on the

grounds that the lapse of the funds in question rendered the instant appeal moot. We took this motion for consideration with the case.

OPINION

I

The jurisdictional argument raised by the State defendants' motion to dismiss is whether the operation of (Ill. Rev. Stat. 1977, ch. 127, par. 161), providing for the lapse of appropriations after the passage of a specific period of time, renders the instant appeal moot.

This lawsuit challenges the right of State officials to reserve or withhold appropriated funds from the purpose intended by the General Assembly. The appropriations act in question (1976 Ill. Laws 339) became effective on July 1, 1976, and expired at the close of fiscal year 1977, on June 30, 1977. Under the 1870 Illinois Constitution, the lapse of appropriations was constitutionally mandated. (Ill. Const. 1870, art. IV, § 18.) Although no lapse provision is contained in the 1970 Illinois Constitution, the lapse of appropriations is governed by statute. The lapse provision provides in pertinent part:

> "All appropriations shall be available for expenditure for the fiscal year or for a lesser period if the Act making that appropriation so specifies. A deficiency or emergency appropriation shall be available for expenditure only through July 30 of the year when the Act making that appropriation is enacted unless that Act otherwise provides.
>
> Outstanding liabilities as of June 30, payable from appropriations which have otherwise expired, may be paid out of the expiring appropriations during the three-month period ending at the close of business on September 30." Ill. Rev. Stat. 1977, ch. 127, par. 161.

Relying on this statutory provision, the State defendants argue that after September 30, 1977, unexpended portions of the appropriation lapsed into the General Revenue Fund and, even if plaintiffs could state a cause of action against the defendants, they would be unable to recover the $100,000 reserved from that appropriation for state budgetary reasons.

In opposition to defendants' motion to dismiss, plaintiffs have advanced serveral arguments. First, plaintiffs maintain that despite the lapse provisions, the $100,000 may still be recovered by mandamus or other relief. Secondly, plaintiffs contend that even if the $100,000 cannot be recovered from the general revenue fund by mandamus, there remains an actual controversy between the parties regarding the right of state executive officials to reserve funds appropriated to the DDC for the purchase of drug treatment services, and that this issue can be resolved by declaratory relief as requested in plaintiffs' amended complaint. Finally,

plaintiffs contend that assuming the instant suit has become moot, there is a substantial public interest in a resolution of the issues raised by plaintiffs' appeal.

The decision in *People ex rel. Polen v. Hoehler* (1950), 405 Ill. 322, 90 N.E.2d 729, holds that mandamus will not issue to compel the expenditure of appropriated funds which have lapsed. (See also *People ex rel. Downs v. Brown* (1917), 281 Ill. 390, 118 N.E. 67.) Yet, we agree with plaintiffs that the unavailability of some of the forms of relief sought in their complaint does not divest this court of jurisdiction to address the underlying controversy.

■■■ The possibility of consequential relief is not a pre-condition to the existence of an actual controversy under the declaratory judgment act. (Ill. Rev. Stat. 1977, ch. 110, par. 57.1.) As stated in *Kern v. Chicago & Eastern Illinois R.R. Co.* (1963), 44 Ill. App. 2d 468, 195 N.E.2d 197, *cert. denied* (1964), 379 U.S. 825, 13 L. Ed. 2d 35, 85 S. Ct. 51:

> "The contemporary application of the doctrine [of mootness] as a matter of policy should be considered in the light of the recent adoption of procedures designed to resolve disputes by means of declaratory judgment proceedings, even though no present issue demands a judgment or decree other than one settling the legal questions involved. The question of when an actual controversy exists for purposes of declaratory judgment proceedings is analogous to the problem of determining when a controversy is or is not moot." (44 Ill. App. 2d 468, 473, 195 N.E.2d 197, 199.)

Thus, even if plaintiffs' request for relief by mandamus is barred by operation of the lapse statute, the existence of an actual controversy which can be resolved by declaratory judgment will defeat a mootness claim.

In *Kern* the court concluded that the doctrine of mootness "will not be applied where it is apparent that the controversy is a genuine one concerning valuable rights and where the party defending maintains that it still has the power to annul those rights and to recreate the condition as it existed at the time the litigation was commenced." (44 Ill. App. 2d 468, 477, 195 N.E.2d 197, 201; see *State Highway Com. v. Volpe* (8th Cir. 1973), 479 F. 2d 1099.) The facts in this case fall within the reasoning of *Kern.* Here, the State defendants strongly assert the right of the executive branch of State government to reserve funds appropriated for a specific purpose by the legislature. Furthermore, the State defendants contend that parties such as plaintiffs are not entitled to compel the expenditure of funds so reserved. The State defendants' position makes it clear that there is a reasonable possibility the parties will find themselves in the same or similar situation in this or some subsequent fiscal year.

The inherent short-term nature of an appropriation and the operation of the lapse statute makes any attempt to judicially review the Governor's

power to reserve those funds within the lifetime of that appropriation an improbable task. Thus, the underlying controversy presented by this case appears to fall within the category of disputes " 'capable of repetition, yet evading review.' " *Nebraska Press Association v. Stuart* (1976), 427 U.S. 539, 546, 49 L. Ed. 2d 683, 690, 96 S. Ct. 2791, 2797.

Finally, we must consider the public interest involved in having this particular issue determined. The question presented by the complaint is of a uniquely public nature, having to do with the division of powers among the branches of State government with respect to the appropriation and expenditure of public funds. Because this question has not been judicially resolved in this State and there is a likelihood that the situation will recur, it is important that an authoritative determination of the remaining issues be made.

## II

■■■ Defendants contend that the named plaintiffs lack standing to maintain this lawsuit. The concept of standing is related to whether the dispute sought to be adjudicated will be presented in an adversary context capable of judicial resolution. The United States Supreme Court, in *Association of Data Processing Services Organizations, Inc. v. Camp* (1970), 397 U.S. 150, 25 L. Ed. 2d 184, 90 S. Ct. 827, presented an appropriate two-part test. (See also *United States v. SCRAP* (1973), 412 U.S. 669, 37 L. Ed. 2d 254, 93 S. Ct. 2405.) The plaintiff must allege that the interest for which he seeks protection is arguably within the zone of interests sought to be protected by the statutory or constitutional guarantee in question and that some substantial injury in fact results from the challenged action. This test has been adopted by the courts of this State. (See *Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 359 N.E.2d 1137.) In resolving this issue we accept as fact all allegations well pleaded in plaintiffs' complaint and all inferences reasonably drawn therefrom. *Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 359 N.E.2d 1137.

Plaintiffs WSO, John Doe and Joseph Doe easily meet the first part of the *Data Processing* test. As drug addicts and a provider of drug treatment services these plaintiffs are clearly within the group of people contemplated by the Dangerous Drug Abuse Act and, consequently, they have an interest in the funding of the programs maintained by the Act. However, defendants contend that because WSO has no guarantee that it would have received the $100,000 withheld, it cannot establish any concrete injury resulting from defendants' refusal to expend that money. This argument fails for several reasons. WSO alleged in the complaint that its contract to provide drug abuse treatment services for fiscal year 1977 was in the amount of approximately $331,000 rather than $431,000 only because the State defendants unlawfully reserved the additional funds.

Even without these specific allegations of injury, the fact that WSO and similar agencies are in the business of treating addicts and that business is funded by the DDC indicates that an overall reduction of funding, if obtained by unlawful means, would result in more than mere speculative injury to WSO and the members of its class. Finally, because of the State defendants' action, WSO and similar agencies have permanently lost the reserved funds which cannot now be allotted from the expired appropriation.

WSO is more than a prospective supplier of services to the government, challenging the essentially discretionary governmental task of contracting for goods and services. Here, the petition alleges that DDC was prevented from even exercising its discretion to contract for services because of the other State defendants' unlawful conduct. (*Cf. Alfred Engineering, Inc. v. Illinois Fair Employment Practices Com.* (1974), 19 Ill. App. 3d 592, 312 N.E.2d 61.) Considering all of the ways in which its interests are affected, it is clear that WSO has an appropriate stake in the outcome of the litigation. See, *e.g., City of New York v. Ruckelshaus* (D.D.C. 1973), 358 F. Supp. 669, *aff'd sub nom. City of New York v. Train* (D.C. Cir. 1974), 494 F. 2d 1033, *aff'd* (1975), 420 U.S. 35, 43 L. Ed. 2d 1, 95 S. Ct. 839.

Similarly, defendants' objections to the standing of the Does must be rejected. Defendants contend that neither Doe can show a specific denial of drug treatment services because of the State defendants' conduct. In *Arlington Heights v. Metropolitan Housing Development Corp.* (1977), 429 U.S. 252, 50 L. Ed. 2d 450, 97 S. Ct. 555, the Supreme Court found that a black citizen had standing to challenge a zoning ordinance which prevented the building of a project to which the plaintiff would probably move if it was completed. In reaching that conclusion, the court stated: "The injury may be indirect [citation], but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions." (429 U.S. 252, 261, 50 L. Ed. 2d 450, 462, 97 S. Ct. 555, 561.) Although other factors may enter into the availability of drug treatment services in this instance, reduced services are at least fairly traceable to the conduct of the State defendants in withholding appropriated funds.

Plaintiff D'Arco's standing to sue as a resident-taxpayer is based on the principle that, under certain circumstances, taxpayers may challenge the alleged illegal use of public funds. Citing *Lynch v. Devine* (1977), 45 Ill. App. 3d 743, 359 N.E.2d 1137, defendants contend that a taxpayer may sue only if the alleged illegal conduct has the effect of increasing governmental spending.

Although it is indeed unusual that a taxpayer would seek to increase State spending, it is not without compelling logic. The concept of misuse of public funds surely includes the illegal withholding of funds appropriated to remedy a matter of great public interest. (See *People ex rel. Newdelman*

*v. Swank* (1970), 131 Ill. App. 2d 73, 264 N.E.2d 794, *rev'd on other grounds sub nom. People ex rel. Newdelman v. Weaver* (1972), 50 Ill. 2d 237, 278 N.E.2d 81; *People ex rel. Hamer v. Board of Education* (1974), 22 Ill. App. 3d 130, 316 N.E.2d 820.) Moreover, the relief sought by this action would not require the State to commit additional funds to be expended, but rather require the dispersal of funds already appropriated. On balance, we conclude that there is a sufficient public interest in the lawful use of funds appropriated for the specific purpose of remedying drug abuse within the State, that would sustain the right of a taxpayer to seek redress.

## III

In the trial court it was urged that judicial review of the State defendants' conduct would violate the concept of separation of powers. (Ill. Const. 1970, art. II, §1.) We recognize that the Governor, as head of the executive branch of State government, has great responsibility for maintaining the fiscal integrity of the State. (Ill. Const. 1970, art. VIII, §2.) The judiciary should not attempt to review budgetary decisions when made by the branch of government having the authority to control spending. The question before us, however, requires an interpretation of the laws and constitution of the State to determine where, in this instance, the power to control spending resides.

■■ It is unquestionably within the province of the judiciary to determine whether the laws or constitution of the State grant the executive branch the authority to withhold funds appropriated by the legislative branch. (See *County of Cook v. Ogilvie* (1972), 50 Ill. 2d 379, 280 N.E.2d 224; *Sioux Valley Empire Electric Association, Inc. v. Butz* (D.S.D. 1973), 367 F. Supp. 686, *aff'd* (8th Cir. 1974), 504 F.2d 168; *State Highway Com. v. Volpe* (8th Cir. 1973), 479 F.2d 1099; but see *Housing Authority v. U.S. Department of Housing & Urban Development* (N.D. Cal. 1972), 340 F. Supp. 654.) If the officials of the executive branch have exceeded the limits of their authority, thereby acting unlawfully, the courts will not hesitate to say so. *Illinois Bell Telephone Co. v. Fox* (1949), 402 Ill. 617, 85 N.E.2d 43.

## IV

■■ Another jurisdictional objection interposed by defendants is that the suit is an action against the State which is barred by the doctrine of sovereign immunity. A well-recognized exception to the statutory bar of sovereign immunity under the Court of Claims Act (Ill. Rev. Stat. 1977, ch. 37, par. 439.1 *et seq.*), allows suits against governmental officials concerning actions in excess of their authority. (*Moline Tool Co. v. Department of Revenue* (1951), 410 Ill. 35, 101 N.E.2d 71; *County of Cook*

*v. Ogilvie* (1972), 50 Ill. 2d 379, 280 N.E.2d 224.) The basic determination that must be made in this case is whether the State defendants were authorized to reserve for State budgetary reasons, part of the funds appropriated by the General Assembly. This is essentially the same question which must be resolved to determine whether this action falls within the exception to the sovereign immunity doctrine. A resolution on the merits of the complaint in favor of plaintiffs necessarily includes a determination that the State defendants exceeded their statutory and constitutional authority and, thus, disposes of the sovereign immunity issue.

## V

■■ It seems clear for the reasons stated that no jurisdictional impediment bars this court from reaching the issue at the heart of this case, whether the Governor's reservation of appropriated funds, solely for fiscal policy reasons, is authorized by the statutes or constitution of the State. In examining this question, we recognize the obvious parallels between the instant case and the Federal "impoundment of funds" decisions. (See, *e.g., State Highway Com. v. Volpe* (8th Cir. 1973), 479 F.2d 1099; *Sioux Valley Empire Electric Ass'n, Inc. v. Butz* (D.S.D. 1973), 367 F. Supp. 686, *aff'd* (8th Cir. 1974), 504 F.2d 168; see generally Annot., 27 A.L.R. Fed. 214 (1976).) Those cases reviewed the right of the executive branch of the Federal Government to impound congressionally appropriated funds. Since the right of State executive officers to reserve funds appropriated for a specific purpose by the General Assembly has never been reached by the courts of this State, we look to the Federal decisions, where relevant, for guidance in resolving the questions before us.

Plaintiffs contend that there is no statutory or constitutional provision authorizing the reservation of appropriated funds for reasons unrelated to the purposes of the appropriation. This first requires an examination and interpretation of the appropriations act and the entire statutory scheme under which the DDC operates. It is our opinion that the legislative history of the appropriations act indicates that it was not the intent of the General Assembly to delegate to the Governor the power to reserve appropriated funds.

The DDC was created by the Dangerous Drug Abuse Act (Ill. Rev. Stat. 1977, ch. 91½, par. 120.4—1) and given the powers, duties and functions, among others, to coordinate the funding of drug abuse functions and "to make such agreements * * * with any * * * private agency * * * as are appropriate to effectuate the purposes of this Act." (Ill. Rev. Stat. 1977, ch. 91½, par. 120.5—6.) The purposes of the Act are set forth in the legislative declaration of public policy, which states "[i]t is imperative that a comprehensive program be established and implemented through the

facilities of the State, * * * and private agencies * * * to provide diagnosis, treatment, care and rehabilitation for controlled substance addicts to the end that these unfortunate individuals may be restored to good health and again become useful citizens in the community." (Ill. Rev. Stat. 1977, ch. 91½, par. 120.2.) The General Assembly made certain that the DDC would have the expertise necessary to achieve those purposes by providing for a commission of members having considerable experience with drug abuse treatment problems. Ill. Rev. Stat. 1977, ch. 91½, par. 120.4—1.

In implementing and effectuating the purpose of the Dangerous Drug Abuse Act, the General Assembly appropriated for fiscal year 1977, $3,545,000 to be used by the DDC to purchase drug abuse treatment services. The appropriations act stated in pertinent part:

> "The following named amounts, or so much thereof as may be necessary, respectively, are appropriated for the objects and purposes thereinafter named, to meet the ordinary and contingent expenses of the Dangerous Drugs Commission:
> For Purchase of Drug Abuse Treatment Services:
> Payable from the General Revenue Fund * * * $3,545,000."

The General Assembly appropriated $3,545,000 although the Governor had requested $100,000 less in his proposed budget. By item veto, Governor Walker reduced the appropriation by $100,000, but the General Assembly overrode that veto and the entire $3,545,000 appropriation was enacted into law.

The intent of the legislature when it made the appropriation and overrode the veto was clearly to authorize the DDC to spend as much of $3,545,000 as needed to purchase services for the treatment of drug addicts and to make the entire amount available to the DDC for that purpose. There is nothing in the act suggesting a legislative intent to vest the Governor with the discretion to reserve any part of that sum for fiscal policy reasons without any regard for the requirements of the specific program for which it was appropriated. The Governor's action effectively eliminated $100,000 from the DDC budget in direct contravention of the expressed intent of the legislature.

The State defendants argue a general appropriation does not mandate that the entire amount appropriated must be spent. We agree that discretion to spend or not to spend within the parameters set by the legislature rests with the agency for whose use the funds have been appropriated. But, "although a general appropriation act may be viewed as not providing a specific mandate to expend *all* of the funds appropriated, this does not *a fortiori* endow the [executive] with the authority to use unfettered discretion as to when and how the monies may be used. The Act

circumscribes that discretion and only an analysis of the statute itself can dictate the latitude of the questioned discretion." *State Highway Com. v. Volpe* (8th Cir. 1973), 479 F.2d 1099, 1109.

■■ The State defendants point out that plaintiffs' complaint sought a writ of mandamus to compel the DDC to use the additional $100,000 to contract for drug treatment services with WSO or a similar organization. Since the specific funds, by operation of the lapse statute, are no longer available, the propriety of issuing a writ of mandamus to compel the DDC to expend the $100,000 on the purchase of drug treatment services has ceased to be an issue. The important question is whether the appropriations act authorizes the Governor to reserve part of the funds essentially eliminating them from the DDC budget and, thus, circumventing the commission's discretionary decision making power over the funds. We can find no statutory basis for permitting the Governor to withhold funds from the DDC.

Defendants also contend that the Governor, as supreme executive officer of the State, had constitutional authority to reserve funds to protect the fiscal integrity of the State. The division of powers in fiscal matters is set out in the Illinois Constitution, article VIII, section 2. The Governor is required to submit to the General Assembly a State budget setting forth estimated receipts and funds on hand and a plan for expenditures and obligations for all State spending agencies. Proposed expenditures are not to exceed funds estimated to be available for the fiscal year as shown on the budget. (Ill. Const. 1970, art. VIII, §2(a).) It is the function of the General Assembly to enact "appropriations for all expenditures of public funds by the State. Appropriations for a fiscal year shall not exceed funds estimated by the General Assembly to be available during the year." Ill. Const. 1970, art. VIII, §2(b).

The economic and fiscal commission act (Ill. Rev. Stat. 1977, ch. 63, par. 341 *et seq.*), adopted by the General Assembly in 1972, created a commission made up of members of the General Assembly which reports on the estimated income of the State and of any other funds estimated to be available for the next fiscal year. The House and Senate by joint resolution must adopt or modify the commission's report. This joint resolution constitutes the General Assembly's assessment of the funds estimated to be available for the fiscal year. Ill. Rev. Stat. 1977, ch. 63, par. 344.

The Governor's fiscal authority includes the veto power to "reduce * * * any item of appropriations * * *." That power is, however, subject to the General Assembly's overriding power to restore the item to its original amount by the majority vote of each house. Ill. Const. 1970, art. IV, §9(d).

In the event of "deficits caused by emergencies or failures of revenue," the General Assembly may authorize the State to borrow. (Ill. Const. 1970,

art. IX, §9(d).) The final audit is performed by the Auditor General, a legislative officer. (Ill. Const. 1970, art. VIII, §3.) The constitution places him under the control of the legislature because he has the "responsibility to assure that funds have been expended for the purposes intended by the General Assembly." Helman and Whalen, Constitutional Commentary, Ill. Ann. Stat., Ill. Const. 1970, art. VIII, §3 (Smith-Hurd 1971).

Reading the applicable constitutional and statutory provisions together, it is apparent that the General Assembly is vested with the ultimate authority to determine both the level and allocation of public spending. The Governor is given no express authority by the constitution to reserve appropriated funds in frustration of the General Assembly's expressed intent.

We cannot agree that the Governor's inherent powers as supreme executive officer (Ill. Const. 1970, art. V, §8) provides the necessary authority to reserve part of an appropriation for fiscal purposes. The same contention, based upon the corresponding provisions of the United States Constitution (U.S. Const., art. II, §§2 and 3), was made by the defendants in the Federal cases arising from President Nixon's attempted impoundment of appropriated funds for reasons of economic policy. The argument was consistently rejected. See, *e.g.*, *Sioux Valley Empire Electric Association, Inc. v. Butz* (D.S.D. 1973), 367 F. Supp. 686, *aff'd* (8th Cir. 1974), 504 F.2d 168; *Local 2677, American Federation of Government Employees v. Phillips* (D.D.C. 1973), 358 F. Supp. 60.

Although no Illinois court has decided the exact issue presented by this case, the limitations of the executive's power over appropriations was discussed in *County of Cook v. Ogilvie* (1972), 50 Ill. 2d 379, 280 N.E.2d 224. There, the Illinois Supreme Court held that an act allowing the Governor to transfer funds from one appropriation to another was an unconstitutional delegation of legislative authority. The court stated:

> "The question here is whether the Governor can be authorized to do what the General Assembly itself could do only by an act duly passed and approved, *i.e.*, divert the funds appropriated for one particular purpose, thereby reducing one appropriation and increasing the other. While the Governor possesses the power to reduce an appropriation by means of an item veto, he could not exercise, nor could the legislature constitutionally delegate to him or a department of the executive branch of government, the power to transfer funds specifically appropriated for one program." (50 Ill. 2d 379, 385, 280 N.E.2d 224, 227.)

The cited case recognizes the separate roles of the executive and the legislative branches in State fiscal matters. To imply that the executive possesses inherent powers which supersede the legislative function of

192

appropriating public funds is to disregard the separation-of-powers doctrine. See *Sioux Valley Empire Electric Association, Inc. v. Butz* (D.S.D. 1973), 367 F. Supp. 686, *aff'd* (8th Cir. 1974), 504 F.2d 168.

For these reasons, we hold that the trial court erred in dismissing plaintiffs' amended complaint for declaratory and injunctive relief. We, therefore, reverse the decision of the circuit court and remand the case for further proceedings consistent with this opinion.

Reversed and remanded.

JOHNSON and ROMITI, JJ., concur.