Charles W. (Bill) ELLIS, Richard J. Franke, Lester A. Petersen, Richard D. Rome, individually and as partners in Valdez Air Terminal Company, Appellants,

v.

CITY OF VALDEZ, Appellee.

No. S–32.

Supreme Court of Alaska.

July 6, 1984.

As Modified July 25, 1984.

Henry J. Camarot, Mark A. Sandberg, Camarot, Sandberg & Hunter, Anchorage (Wallace Rudolph, Tacoma, Wash.), of counsel, for appellants.

Richard W. Garnett III, Roger A. Lubovich, Erwin, Smith & Garnett, Anchorage, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, and COMPTON, JJ.

## OPINION

BURKE, Chief Justice.

In this case we review the superior court's grant of summary judgment dismissing appellants' complaint. Appellants, Charles W. (Bill) Ellis, Richard J. Franke, Lester A. Petersen, Richard D. Rome, individually and as partners in Valdez Air Terminal Company (hereinafter collectively referred to as "Ellis"), challenge the dismissal.

In reviewing an order granting summary judgment, we must draw all reasonable inferences in favor of the non-prevailing party. *Swenson Trucking & Excavating, Inc. v. Truckweld Equipment Co.,* 604 P.2d 1113, 1116 (Alaska 1980). If in so examining the record, we discover the existence of a genuine issue as to any material fact, or if it appears that the prevailing party was otherwise not entitled to judgment as a matter of law, we must reverse the order and remand the case for trial. In the present case, we agree with the superior court that Valdez is entitled to summary judgment on each claim advanced by Ellis. We therefore affirm.

## I. FACTS

Ellis owns and operates the Valdez airport terminal. He built the facility in 1974, on land leased by Valdez from the State of Alaska and subleased to Ellis. Between 1974 and 1980 Valdez considered various means of acquiring the terminal from Ellis as part of the city's plans for airport improvements.

The major events leading to this lawsuit all occurred during 1980. Early in the year, Mark Lewis (then City Manager of Valdez) indicated orally to Ellis that Valdez was interested in purchasing the terminal. Ellis and Lewis agreed that an appraisal would be performed by the Appraisal Company of Alaska. This company later performed an appraisal, valuing the terminal property at $4,750,000.

During the legislative session, House Bill 60 was introduced in the legislature. This bill would have provided an appropriation of $2,500,000 for "Valdez—airport runway extension and lighting." The substitute bill which was eventually enacted in place of HB 60 [1] contained a $7,000,000 transportation appropriation for "Valdez—runway extension, lighting and terminal."

In June 1980 Mark Lewis wrote to Ellis, stating that "[t]he City of Valdez wishes to begin finalized negotiations for the purchase of the air terminal building, within the next two weeks. We would like to have these negotiations completed and the sale consummated within 60 days."

Pursuant to AS 37.05.315(a),[2] the Alaska Department of Administration notified Valdez of the transportation appropriation, and in July 1980 Valdez and the Alaska Department of Administration entered into an agreement which contained a narrative outline of the projects contemplated by Valdez. The narrative described the improvements to be made to the runway and lighting systems, and continued:

> The proposed grant of $7,000,000 is to provide for the construction of the improvements and also the purchase of the terminal from Bill Ellis. This is in accordance with state policy encouraging municipal ownership of airport facilities, to assure that airports will maintain an ongoing, responsive level of public service.

Bids for the runway and lighting work were submitted to Valdez in the summer of 1980. Low bid was $2,648,000. This bid was apparently accepted, but the amount authorized for expenditure on this work was increased over the course of subsequent city council meetings to more than $4,000,000. Valdez committed all but approximately $2,900,000 of the appropriated funds to airport improvements.[3]

Sometime during 1980, Valdez conducted an "in-house" appraisal of the terminal, determining its value to be $3,100,000. In September 1980, Valdez offered Ellis $3,100,000 for the terminal. Ellis rejected

**1.** Free Conference Committee Substitute for House Bill 60 was enacted as ch. 50, SLA 1980.

**2.** AS 37.05.315(a) reads in part:
When an amount is appropriated or allocated as a grant to a municipality, the Department of Administration shall promptly notify the municipality of the availability of the grant. When the Department of Administration receives an agreement executed by the municipality which provides that the municipality (1) will spend the grant for the purposes specified in the appropriation or allocation; (2) will allow, on request, an audit by the state of the uses made of the grant; and (3) assures that, to the extent consistent with the purpose of the appropriation or allocation, the facilities and services provided with the grant will be available for the use of the general public, the Department of Administra-

tion shall pay the grant directly to the municipality.

**3.** Ellis charges that some of the funds were expended for purposes outside the scope of the allocation, thus reducing the funds available to Valdez for the purpose of purchasing the terminal from Ellis. Ellis' challenge is not in the nature of a "taxpayer suit;" it is that Ellis, in his capacity as owner of the airport terminal, was individually injured by Valdez' alleged misspending of the appropriated funds. Given our holding that under the appropriation act, Valdez had no duty to offer the appropriated funds to Ellis (section III, *infra*), this allegation is not relevant to the present case. We do not reach the issues of whether any misspending did occur, or of any standing on Ellis' part to raise the issue.

this offer at a Valdez City Council meeting. Valdez City Manager Mark Lewis sent Ellis a letter noting this fact, and stating that "no further action [is] scheduled regarding this matter." During the September 1980 negotiations, Lewis had allegedly informed Ellis that Valdez did not "have to buy the airport ... we can let you go broke and pick up the pieces." Valdez never purchased the terminal from Ellis.

In July 1982, Ellis filed suit against Valdez. In September 1982, he sued the State of Alaska. These actions were consolidated on the state's motion. The state was voluntarily dismissed by stipulation dated July 5, 1983. On July 20, 1983, the superior court, Judge Moore presiding, entered summary judgment in favor of Valdez on all counts. Ellis appealed, claiming that evidence introduced before the court raised genuine issues as to whether: (a) he was an intended third party beneficiary of a contract between appellee City of Valdez and the State of Alaska, (b) Valdez was under a statutory duty to purchase the Valdez airport terminal from him, and (c) Valdez tortiously interfered with his prospective economic advantage.

## II. THIRD PARTY BENEFICIARY

Ellis first claims he was an intended third party beneficiary of the appropriation grant, or of the agreement which Valdez was required by AS 37.05.315(a) to make with Alaska before disbursement of the appropriation. He claims he is entitled to enforce the agreement, or to sue for his damages resulting from a breach thereof.

Assuming, without deciding, that the contractual concept of third party beneficiary rights can apply in the legislative grant situation, Ellis' argument is unpersuasive. We have previously stated that, "[a]bsent evidence that the parties to the contract 'either intended or contemplated that one purpose of the [contract] would be to benefit a third party ... [that party is]

at best an incidental beneficiary and as such can claim no damage ....'" *White v. Alaska Insurance Guaranty Association*, 592 P.2d 367, 369 (Alaska 1979), *quoting Century Insurance Agency v. City Commerce Corp.*, 396 P.2d 80, 82 (Alaska 1964).

The primary purpose of the grant in question was to place the airport terminal in Valdez' hands. According to the Valdez/Alaska agreement, purchase of the terminal "is in accordance with state policy encouraging municipal ownership of airport facilities, to assure that airports will maintain an ongoing, responsive level of public service."

Ellis contends that the municipality and the state intended this grant to serve at least one other purpose—namely to benefit him. He cites three facts to support his contention: (a) Valdez indicated to Ellis a desire to buy the terminal, (b) Ellis owned the terminal, and (c) the agreement provided for "purchase of the terminal from Bill Ellis."

■ The facts Ellis relies on do not raise an inference that Valdez and Alaska intended to benefit him. An illustration from the Restatement (Second) of Contracts is on point:

B contracts with A to buy a new car manufactured by C. C is an incidental beneficiary, even though the promise can only be performed if money is paid to C.[4]

The most Ellis can prove on the facts presented is that he was an incidental beneficiary of any contract between Valdez and the state. As such he has no enforceable rights in the contract. *Century Insurance Agency*, 396 P.2d at 82. Summary judgment was appropriately granted in Valdez' favor on this claim.

## III. LEGISLATIVE MANDATE

Ellis next contends that Valdez, by accepting the grant, bound itself to purchase the terminal.[5] Ellis' claim rests upon his

---

4. Restatement (Second) of Contracts § 302 comment e, illustration 17 (1981).

5. Ellis first argues that by accepting the grant, Valdez bound itself to purchase the terminal at fair market value, even if the city would have had to supplement the appropriation to do so.

assertion that an appropriation of state funds amounts to a legislative mandate that the municipality which is to receive the funds must accomplish the purpose for which the legislature has set the funds aside.

■ Not surprisingly, our research reveals few cases in which a municipality or a state agency has been taken to court for failing to spend monies appropriated to it.[6] The cases in which the issue has arisen have sprung from two distinct situations. First is the situation where the legislature has set aside funds for the discretionary use of an administering authority, without expressing or implying any directive to the administering authority to accomplish the purpose for which the funds were set aside. The rule in such cases is that "discretion to spend or not to spend within the parameters set by the legislature, rests with the agency for whose use the funds have been appropriated." *West Side Organization Health Services Corp. v. Thompson*, 73 Ill.App.3d 179, 29 Ill.Dec. 129, 391 N.E.2d 392, 401 (1979), *rev'd on other grounds*, 79 Ill.2d 503, 38 Ill.Dec. 784, 404 N.E.2d 208 (1980). Another expression of the rule is: "An appropriation of public monies by the legislature is not a mandate to spend, rather it is an authorization given by the legislature to a designated agency to use not to exceed a stated sum for specified purposes." *Island County Committee on Assessment Ratios v. Department of Reve-*

*nue,* 81 Wash.2d 193, 500 P.2d 756, 763 (1972).

Thus, one state legislature's:

appropriation of sufficient funds to allow state employees to receive an eight percent (8%) salary increase ... did not constitute a mandate that state employees receive that or any salary increase nor did the act of appropriating the money vest in the state employees any legal interest or right in a salary increase upon which to predicate a cause of action on their failure to receive one.

*American Federation of State, County, and Municipal Employees, Council No. 95 v. Olson*, 338 N.W.2d 97, 103 (N.D.1983).

The second situation which gives rise to lawsuits over an agency's failure to expend appropriated monies occurs when the legislature both sets aside funds to be used by an administering authority for a particular purpose, and affirmatively directs the authority to accomplish the specified purpose. Illustrative of this situation is *Felicetti v. Secretary of Communities and Development*, 386 Mass. 868, 438 N.E.2d 343 (1982).[7] In that case, a state agency interpreted the language of a state appropriations act to prohibit the agency's release of funds appropriated for home energy assistance until federal approval of the state energy assistance plan had been obtained. The court interpreted the act otherwise, holding that the legislature had expressed its intent not only that the funds be available for release before federal approval of the state plan, but also that the agency

His alternative argument is that Valdez was at least bound to offer whatever portion of the appropriation was allocated by the legislature specifically for purchase of the terminal, in an attempt to purchase it. Whether the legislature intended to allocate a particular portion of this $7,000,000 appropriation specifically for purchase of the terminal is a contested issue which, in light of our holding, we need not reach. *See* note 3, *supra*.

**6.** Impoundment cases, in which the executive branch refuses to release funds to the administering agency to which they were appropriated, are more common. *See, e.g., State Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir.1973); *West Side Organization Health Services Corp. v. Thompson*, 73 Ill.App.3d 179, 29

Ill.Dec. 129, 391 N.E.2d 392 (1979), *rev'd* 79 Ill.2d 503, 38 Ill.Dec. 784, 404 N.E.2d 208 (1980).

**7.** *See also National Council of Community Mental Health Centers, Inc. v. Weinberger*, 361 F.Supp. 897 (D.D.C.1973). In *Weinberger*, which involved the United States Department of Health, Education and Welfare's withholding of funds appropriated by Congress for grants to community mental health centers, the court noted that "[t]he controlling question ... is whether the money authorized under the legislation was appropriated to be spent at the discretion of the Executive, or appropriated *with an affirmative direction* that the money be fully spent within the fiscal year." 361 F.Supp. at 901 (emphasis added).

process applications and distribute funds before that time. The court held that the agency's failure to do so violated the legislative intent expressed in the appropriations act.

■ The instant case fits into the first situation outlined above; we find no indication of a legislative mandate directing Valdez to acquire the Valdez air terminal.[8] The appropriation act simply states that $7,000,000 is appropriated for "Valdez—runway extension, lighting and terminal."[9] The statutory definition of "appropriation" —"a maximum amount available for expenditure by a state agency for a stated purpose set out in an appropriation act"[10]—does not mandate accomplishment of the stated purpose by the receiving authority.

■ We cannot accept Ellis' argument that AS 37.05.315(a) and the agreement entered into between Valdez and the state pursuant to that statute obligated Valdez to purchase the terminal. The statute, which applies to all state appropriations or allocations granting money to a municipality, states: "When the Department of Administration receives an agreement executed by the municipality which provides that the municipality (1) will spend the grant for the purposes specified in the appropriation ... the Department of Administration shall pay the grant directly to the municipality."[11] Ellis would read this language to require every municipality executing such an agreement to actually spend the appropriated monies. This interpretation would mean that a municipality wishing to embark on a project involving state funding would become irreversibly committed to the project at the moment it signed

the agreement required for it to obtain state funds. No change in conditions or reassessment of the merits of the project would allow the municipality to reconsider its position. According to Ellis' interpretation, even if the municipality and the state agreed that it would be unwise for the municipality to go forward with the project, any "interested citizen" could force the municipality to spend state funds to do so.

■ We do not accept this reasoning. A more reasonable interpretation of the statute is that an agreement must be executed between the Department of Administration and the municipality in order to insure that both parties understand and agree on the exact purposes for which the allocation may be spent, and to impress upon the municipality that the grant is available for such purposes, and for no others.[12]

Valdez was under no statutory duty to purchase the air terminal from Ellis; summary judgment in Valdez' favor on this issue was appropriately granted.

## IV. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Ellis' final claim is that Valdez intentionally interfered with Ellis' prospective economic advantage. This tort has yet to be recognized in Alaska; we consider it for the first time in this appeal.

In *Long v. Newby*, 488 P.2d 719 (Alaska 1971), Alaska joined the majority of American jurisdictions in recognizing the tort of intentional interference with contractual relations. That cause of action promotes an individual's security and integrity in his

8. We reserve decision as to the legal effect such a mandate would have, if such did exist in the present record. We note that the few cases which address the "duty to spend" issue involve administrative agencies, not local governmental bodies.

9. Ch. 50, 94:16 SLA 1980.

10. AS 37.05.325 (referencing 37.07.120(3)).

11. AS 37.05.315(a).

12. Insofar as Ellis bases his claim not upon the statute, but upon the agreement, his claim must fail. The agreement, executed on a form provided by the Department of Administration (*see* AS 37.05.315(a)), goes no further than the statute in imposing a duty to purchase on Valdez. In fact, the relevant "Grant Condition" in the agreement is clearer than the statute on this point, stating: "The Grantee ... will spend the grant *only* for the purposes specified above," (emphasis added).

contractual relations by protecting those relations from wrongful intermeddling by third parties.

A related interest, the individual's expectation of a fair opportunity to conduct legitimate business affairs free from wrongful intermeddling by others, is also widely protected in American jurisdictions, through the tort theory of intentional interference with prospective economic advantage.[13] Under this theory, a person who is involved in an economic relationship with another, or who is pursuing reasonable and legitimate prospects of entering such a relationship, is protected from a third person's wrongful conduct which is intended to disrupt the relationship. *Buckaloo v. Johnson*, 14 Cal.3d 815, 122 Cal. Rptr. 745, 537 P.2d 865, 871–72 (1975); Restatement (Second) of Torts § 766 B (1979).[14] The cause of action protects both continuing business or customary relationships not amounting to formal contracts, and prospective business or contractual relations which, absent interference, would culminate in pecuniary benefit to the plaintiff.[15]

The theories of interference with contractual relations and interference with prospective economic advantage have developed parallel to one another, and together foster society's interest in maintaining stability and certainty in economic transactions. Both causes of action are necessary to this end,[16] for as one court stated in an early decision:

[It is] impossible to draw a distinction between a right of property and a right of acquiring property that will make a disturbance of the latter right any less actionable than a disturbance of the former. In a civilized community, which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property, once it is acquired, but left unprotected by the law in his efforts to acquire it. *Brennan v. United Hatters of North America*, 73 N.J.Law 729, 65 A. 165, 171 (1906).

Ellis first contends that Valdez interfered with the potential relationship developing between himself and the state, by failing to offer Ellis $4,500,000 which he claims was granted to the city specifically for purchase of his terminal. According to Ellis, "Valdez was little more than a conduit" with regard to the funds appropriated. This contention is without merit. As noted above, the appropriation merely authorized Valdez to expend state funds to acquire the terminal. The decisions of whether or not to acquire the terminal, and of how much to expend on the acquisition, were Valdez' to make. Indeed, had the deal gone through, the terminal would have belonged to Valdez, not to the state. Therefore, any potential economic relationship of Ellis' was with Valdez, not with the state.

In his reply brief, Ellis implies that Valdez improperly interfered with the relationship developing between Ellis and Valdez itself. He argues that Valdez acted tortiously by (a) beginning activities designed to culminate in Valdez' purchase of the terminal from him, and (b) failing to follow through on these actions. But Val-

---

**13.** *See generally* F. Harper & F. James, The Law of Torts § 6.11 (1956); W. Prosser, The Law of Torts § 130 (4th ed. 1971); Restatement (Second) of Torts §§ 766B, 774B and Special Note to § 774B (1979).

**14.** Of course, not every disruption is wrongful. Bona fide competition for customers, for example, not only is allowable, but is fundamental to our economic system. Generally, persons are allowed more leeway to interfere with prospective economic relations than they are to interfere with existing contractual relations. W.

Prosser, The Law of Torts § 130 at 954 (4th ed. 1971).

**15.** *See* F. Harper and F. James § 6.11, at 512 (1956); Restatement (Second) of Torts § 766B comment c (1979).

**16.** Indeed, it has been stated that the tort of interference with contractual relations is merely a species of the tort of interference with prospective economic advantage. *Buckaloo v. Johnson*, 14 Cal.3d 815, 122 Cal.Rptr. 745, 573 P.2d 865, 869 (1975).

dez' actions do not constitute intentional interference with another's prospective economic advantage. The only act of Valdez' which "interfered" with Ellis' prospective advantage was the city's decision not to purchase Ellis' terminal on Ellis' terms. This "arms-length" dealing is not the type of conduct proscribed by the tort. Instead, the cause of action contemplates wrongful interference with a developing relationship by an outsider to that relationship. *Olson v. Scholes*, 17 Wash.App. 383, 563 P.2d 1275, 1280 (1977); Restatement (Second) of Torts § 766B (1979). A party who backs away from a developing economic relationship cannot be held liable in tort for inducing himself to sever the relationship.

Today we recognize the tort of intentional interference with prospective economic advantage, but we conclude that Ellis has not alleged facts sufficient to constitute a prima facie case. The superior court correctly granted Valdez' motion for summary judgment on this issue as on the other issues.

The order of the superior court is AFFIRMED.

MOORE, J., not participating.