332 P.2d 933

Alma J. JANKE and Hazel M. Janke, Plaintiffs and Respondents,

v.

George L. BECKSTEAD, Jr., and Fay D. Beckstead, Defendants and Appellants.

No. 8866.

Supreme Court of Utah.

Dec. 12, 1958.

King & Hughes, Salt Lake City, for appellants.

Duncan & Duncan, Adam M. Duncan, Salt Lake City, for respondents.

WADE, Justice.

Alma J. Janke and his wife brought this action to reform a deed to real property which they had purchased from Fay Beckstead and her husband, George L. Beckstead, to conform to what they alleged were the intentions of the parties. This appeal is from a judgment granting the reformation.

█ Appellants contend that the court erred in admitting parol evidence to vary the description in the deed because it contained no latent ambiguities and sufficiently identified the land conveyed. This is not the rule where reform of an instrument is sought on the ground of mutual mistake or fraud. As stated in 45 Am.Jur. page 650, Reformation of Instruments, Sec. 113:

"It is practically a universal rule that in suits to reform written instruments on the ground of fraud or mutual mistake, parol evidence is admissible to establish the fact of fraud or of a mistake and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had, and this, even though the instrument in question is within the statute of frauds. So far as the introduction of such proof may be said to violate the statute, it is immaterial whether it comes from the complainant or the respondent. The nature of the action is such that it is outside the field of operation of the parol-evidence rule. * * *"

See also Sine v. Harper, 118 Utah 415, 222 P.2d 571.

At the conclusion of the trial, and after it had heard arguments on the question of the intention of the parties at the time of the signing of the original contract, the court expressed the opinion that the evidence was "clear and convincing that at the time the deed was signed, conveying the property from Fay Beckstead to the plaintiffs, that the intention was to convey a strip of land 200 feet deep, beginning at the easterly edge of Ninth East, which would be 233 and a fraction feet, from the center of Ninth East." The description in the deed which was reformed had the commencing point in the center of Ninth East Street, which point is 33 feet west from the point the court found it was the intention of the parties to start. The description in the uniform real estate contract the parties signed reads as follows:

"Com in cen county road 16.2 chs S & W 86°10'W 13.55 chs fr cen Sec. 8, T 2S, R 1E, SL Mer, thence 140 feet South, thence 200 feet East, thence 140 feet North, thence 200 feet West to point of beginning.

250

"Together with one share Tanner Ditch Water Company."

■ It is well settled that this court will not disturb the findings of a court in an equity case if such findings are not against the weight of the evidence.[1]

Although some of the testimony of the witnesses was irreconcilable the court could reasonably have found from all the evidence and circumstances surrounding the transaction that on January 30, 1951, respondents Janke bought a home known as 5164 South Ninth East Street, in Salt Lake County, Utah, from appellants Fay and George L. Beckstead, who had built it on ground obtained from Fay Beckstead's father. That respondents moved into this home in the fall of 1951 and built a dog run on the property about 200 feet east of the east boundary of Ninth East Street. That the Becksteads knew of the dog run being situated where it is because they could see it when they frequently visited with Fay Beckstead's father, who at the time of the trial was still living in the neighborhood.

The negotiations for the sale of the property were made through Mr. E. R. Beckstead, an uncle of appellant, George L. Beckstead, Jr., who had obtained a listing of the property from his nephew for a real estate firm by which the uncle was employed at the time. This listing described the ground as being 100 by 125 feet. This was only a part of a larger tract of land owned by appellants. Respondents did not think the lot offered with the home would give them sufficient room for dogs, which Mr. Janke was interested in training, and appellants consented to sell them more ground for a consideration of $500 more than originally asked. The earnest money agreement dated January 13, 1951, therefore described the property as including a home and ground 140 feet front by 200 feet deep. This still left appellants owning some contiguous property east and south of that sold to respondents.

Before the earnest money agreement was signed by the parties respondents wanted to know where the property line commenced and inquired of the uncle if something definite could be established as to where the measurements could be started, and he replied he would speak to his nephew and return with the information. Within a week the uncle returned and brought a plat which had been furnished by appellants in connection with their application for a Federal Housing Administration loan before they built the home which they sold to respondents and told them it described the ground they were buying, and that it started at the fence line. The fence line referred to was 33 feet west of the

---

1. Stanley v. Stanley, 97 Utah 520, 94 P. 2d 465; Morley v. Willden, 120 Utah 423, 235 P.2d 500; Randall v. Tracy Collins Trust Co., 6 Utah 2d 18, 305 P.2d 480.

center of Ninth East Street on the east edge of Ninth East Street, and the measurements contained therein, although no starting point was shown, coincided on the ground with what respondents were told was the starting point.

The uniform real estate contract which the parties executed on January 30, 1951, contained a metes and bounds description as did the warranty deed which was dated December 29, 1951. Neither of these instruments specifically mentioned any right of way over the west 33 feet of the property conveyed nor did the conveyance to appellants from their predecessors in interest mention any such right of way. The only places specific mention of such a right of way are made are in the mortgage and an attorney's opinion. This attorney customarily examined titles on loans to be made by the company which refinanced the loan for respondents on the mortgage originally given by appellants as mortgagors. Respondents testified that they did not examine these documents, and it is significant that these documents remained in the possession of the mortgagee and also that the description in these documents covered a lesser tract of land than that sold respondents.

Respondents testified that they first became uneasy about the description of the land they purchased when they saw a tax notice for 1952 which showed the property as commencing in the middle of the street. Mr. Janke thereupon contacted appellant, George Beckstead, who assured him that the monument of the commencing point was the north corner fence, and that he would come and straighten the matter out. In the spring or summer of 1953 George Beckstead did come out with his father-in-law who was appellants' predecessor in interest and who still lived in the neighborhood and made measurements of the property involved herein. In so doing they started at a stake at the northwest corner of the fence and with a tape measured south 140 feet to a stake on the fence line, then east 200 feet where Beckstead placed a stake, then north 140 feet where Beckstead placed another stake. Subsequently Mr. Beckstead and another man came back to measure the west boundary line of appellants' property which was contiguous to respondents' east property line. This time the measuring was commenced from a point in the middle of Ninth East Street which was 33 feet west of the fence line stakes from which Beckstead and his father-in-law had commenced their measurements and from which measurements the stakes had been driven into the corners as outlined above. Beckstead tried to put in a fence coinciding with his latest measurements as a boundary of appellants' west and respondents' east line but respondents prevented him from doing so. This suit was the result of the parties failing to reconcile their differences.

In reviewing the evidence it is important to keep in mind that the defendants had employed Mr. E. R. Beckstead, the uncle, as their agent to deal with this property and had thus endowed him with authority to act in their behalf. His actions being chargeable to them, there is ample basis in the evidence from which the trial court could reasonably conclude that it is clear and convincing that both parties at the time the sale was made and the documents executed intended that respondents should have a tract of land with a frontage of 140 feet and a depth of 200 feet, and that this depth should not be diminished by a 33 foot right of way, and both parties were mutually mistaken in believing that the documents did convey such a tract of land. The court therefore did not err in granting the judgment reforming the deed to conform with actual intent of the parties.

Affirmed. Costs to respondents.

McDONOUGH, C. J., and CROCKETT, J., concur.

WORTHEN, J., concurs in results.

HENRIOD, Justice (dissenting).

I dissent. The facts related in the main opinion all spring from highly self-serving testimony of the plaintiffs, and all the substantial facts therein recited were categorically denied. All of those facts are quite incompatible with undeniable physical facts irrefutably pointing to an absence of *mutual* mistake that would justify the reformation of an instrument of title, properly acknowledged, presumably examined and recorded by the people who now attempt to attack it on grounds such mistake was established by clear and convincing evidence. Furthermore, what appears to be significant evidence is either minimized by or left out of the main opinion. As opposed to what I believe are weak facts reported, there are unassailable circumstances that destroy any conclusion that a mutual mistake was shown by clear and convincing evidence.

In 1951, a real estate contract was executed by the parties, clearly describing the property by metes and bounds as commencing in the center of the street. The seller, Mrs. Beckstead, never met the Jankes until the execution thereof. Plaintiffs agreed to assume a mortgage which also described the property as commencing in the middle of the street, as did an attorney's title opinion given incident to the assumption of the mortgage. A warranty deed conveying title to plaintiffs also clearly described the property as "Commencing at a point in the center of a county road" was executed and recorded. All of these clear, unequivocal descriptions are ignored by the trial court and the main opinion, apparently on the unsubstantial basis that the *testimony of the plaintiffs* (both of them) was to the effect that they had not read the documents. In the past this court has not accepted any

such explanation.[1] It seems inconceivable that the *defendant* sellers either had not read these descriptions or that by any stretch of the imagination mistakenly could have believed that "Commencing in the middle of a county road" meant "Commencing on the East line of a county road"; and it is elementary, of course, that the kind of mistake that will justify reformation if established by clear and convincing evidence, must be a *mutual*, not a unilateral mistake.

Another significant fact negating any mutual mistake or intention to convey more property than described is that, as the property was described, the seller here had 75 feet of property remaining, suitable for a building lot, whereas, after reformation by the court, she had but 42 feet, which common knowledge tells us would be worthless as a building lot or for most anything else, for that matter. The very fact of reformation which reduces the remaining area to a 42-foot strip, is significant in disproving any intent to convey more property than that described in the documents of title, all of which plaintiffs had a duty to examine carefully.

Also it is significant that the mortgage loan company obviously was not apprised of any intention to convey more property than clearly described, nor was the title examining attorney aware of any such intention; and it is almost inconceivable that such company would have permitted the execution and recordation of the warranty deed had it been aware of the fact that the parties had some other property in mind.

In October, 1953, defendants in writing notified plaintiffs of their incursion onto the former's property. In May, 1954, they renewed this notice in writing, demanding $25 per month rental for the use of the disputed property or removal therefrom. In March, 1955, they had their counsel notify plaintiffs in writing of their insistence on the rental or removal.

The above facts are mostly physical and hence unassailable, pointing to an absence of any intention to sell more land than that clearly described in the documents of title. On the other hand, most of the facts related in the main opinion originate in the self-serving testimony of the plaintiffs themselves, and are unsupported by any uncontroverted facts,—certainly no undeniable physical facts.

The main opinion makes a point that defendants saw the dog run which plaintiffs built. True: But the undisputed fact is that having seen it they notified plaintiffs in October, 1953, of such intrusion, and later insisted on rental or removal. The opinion (relating the testimony of plain-

1. Garff Realty Co. v. Better Buildings, 1951, 120 Utah 344, 234 P.2d 842; Ephraim Theatre Co. v. Hawk, 1958, 7 Utah 2d 163, 321 P.2d 221; Jensen's Used Cars v. Rice, 1958, 7 Utah 2d 276, 323 P.2d 259.

tiffs), states that an uncle of defendants brought a plat to plaintiffs showing the starting point to be at a place on the side of the street, all of which the uncle denied. The opinion asserts that neither the real estate contract nor the warranty deed that followed it mentioned any right of way over the West 33 feet of the property. This statement is not accurate. A description calling for a commencement point in the middle of a public street is tantamount to a description calling for an easement in the public over the area between the middle of the street and the side of the street. The opinion says it is significant that the title documents (which plaintiffs claim they did not read) remained in the possession of the mortgagee. This does not seem significant at all, but presupposes that plaintiffs were precluded from seeing them, an assumption unsupported in the record, and ignores the obligation of signatories to contracts to read the instruments they sign. The opinion goes on to say it is significant that the description in the documents covers a lesser tract than was sold. This is an amazing non sequitur, assuming the whole case, begging the question and ignoring the unassailable facts mentioned. Further, the opinion says that the *respondents* testified they became uneasy about the description on receiving the 1952 tax notice which bore the same description as the other documents; that they contacted defendants who assured them the matter would be straightened out, all of which was denied. It is significant therefore, that after such contact in 1952, the defendants in October, 1953, notified plaintiffs to get off the property, notified them again in May, 1954, and again in March, 1955, the while the plaintiffs did nothing about this lawsuit until 1956. The opinion states that one of the defendants (according to plaintiff's testimony) came to the property early in 1953 and assured the plaintiffs that the property was that claimed by them and not by a description starting in the middle of the street. This was denied. Denied or not, it is quite inconsistent with the undisputed physical facts that plaintiffs were ordered off the property in the same year, 1953, again in 1954, and again in 1955, while the plaintiffs waited until 1956 to assert their claimed, but highly questionable rights.

The evidence is clear and convincing in reverse in this case, the irrefutable facts pointing to an intention to convey only that which was clearly described and to a complete failure to sustain the burden of proving a *mutual mistake* by clear and convincing evidence. To say there is clear and convincing evidence to support the decision here, in my opinion, is to attach to that phrase a connotation that is unusual and traditionally unsupported by authority.

The case should be reversed. (Emphasis added.)