659 P.2d 1189 (1983)
AMFAC HOTELS AND RESORTS, INC. and Marriott Corporation, Appellants/and Cross-Appellees,
v.
STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, Appellee/and Cross-Appellant.
Nos. 5833, 6124.
Supreme Court of Alaska.
February 18, 1983.
*1190 Susan Wright Mason, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellants/cross-appellees.
Martha Mills, Asst. Atty. Gen., Anchorage, Wilson L. Condon, Atty. Gen., Juneau, for appellee/cross-appellant.
Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

OPINION
MATTHEWS, Justice.
This appeal arises from an action brought by AMFAC Hotels and Resorts, Inc. ("AMFAC") to reform a contract for concession rights to Anchorage International Airport.[1]
In 1953, the United States government and Northwest Airlines, Inc., AMFAC's predecessor in interest, executed an agreement granting Northwest the exclusive right to sell food and beverages in the airport terminal building for a period of ten years. In 1961, the State[2] and Northwest amended the agreement to give Northwest first refusal rights to all new operations *1191 and extended the term of the agreement to June 30, 1984. A subsequent amendment in 1968, entitled "Supplemental Agreement No. 3," placed geographical limitations on the scope of the first refusal rights. Attached to the Supplemental Agreement as "Exhibit C" was a diagram of the layout of Anchorage International Airport with a 1600' diameter circle superimposed upon it. Article XI of the agreement provided that Northwest would enjoy a right of first refusal to new concessions "within the area designated as Exhibit C."
In December 1979, the State announced that concession rights to a new satellite terminal north of the area encompassed by Exhibit C would be open to public bid. The State and AMFAC were at the time negotiating to extend Supplemental Agreement No. 3.[3] However, due to the State's public bidding announcement they could not agree on the scope of concession rights previously granted, and resolved to settle the question, if necessary, through litigation.[4]
AMFAC subsequently filed suit asserting that the parties to the 1968 agreement intended that Northwest's concession rights include all expansions of the passenger terminal facilities, whether or not within the bounds of Exhibit C. It based this assertion on the alleged outcome of a meeting which occurred prior to the execution of Supplemental Agreement No. 3. On May 29, 1968, Harold Strandberg, then Commissioner of the State Department of Public Works, and Roland Chambers, then Director of Properties for Northwest, met with other Northwest and State officials to reach an agreement on the scope of Northwest's rights.[5] According to the affidavits and testimony of both Strandberg and Chambers, the general understanding reached at the meeting was to grant Northwest first refusal rights to any expansion or addition to the passenger terminal. Exhibit C, they insisted, "simply depicted an area which included all of the contemplated terminal expansion areas at the Airport." AMFAC argued that, because the Supplemental Agreement did not express the principal parties' intentions, it should be reformed or else interpreted to grant a right of first refusal to concessions in the new satellite terminal and in any other expansions built during the term of the contract.
The State, on the other hand, maintained that the parties did not intend to extend Northwest's concession rights beyond the area described by Exhibit C. The trial court agreed, and therefore refused to reform or interpret Supplemental Agreement No. 3 as urged by AMFAC.
In this appeal AMFAC argues that the lower court erred in refusing to reform the Supplemental Agreement. Alternatively, AMFAC contends that the trial court should have interpreted the agreement as granting AMFAC first refusal concession rights to all passenger terminal facilities, including future expansions.

REFORMATION
AMFAC asserts that the trial court erroneously required it to prove that a "binding agreement" as to the scope of Northwest's *1192 concession rights existed prior to the final written execution of Supplemental Agreement No. 3. It maintains that all it had to show was "that the parties have agreed upon an object to be accomplished by the written instrument." AMFAC argues that, since the parties to the Supplemental Agreement intended that Northwest have first refusal concession rights to future expansions, reformation should have been granted.
To obtain reformation of a written agreement, the party seeking it must show by clear and convincing evidence that reformation is warranted. Kupka v. Morey, 541 P.2d 740, 749-50 (Alaska 1975).
Reformation of a writing is justified when the parties have come to a complete mutual understanding of all the essential terms of their bargain, but by reason of mutual mistake, or its equivalent, the written agreement is not in conformity with such understanding in a material matter.
Durkee v. Busk, 355 P.2d 588, 591 (Alaska 1960) (footnotes omitted; emphasis added).
We accept AMFAC's assertion that a final and binding prior agreement is not necessary to satisfy the Durkee requirement of a "complete mutual understanding." Restatement (Second) of Contracts § 155 at 406 (1981); 9 J. Wigmore, Evidence § 2417 at 61 (Chadbourn Rev. 1981). However, from the record we conclude that the trial court did not in fact require AMFAC to prove that such an agreement existed.
Various of the judge's comments at trial indicate that he correctly understood the applicable law. For example, he stated:
Under the law which pertains to the reformation of contracts, there must be an agreement to which an imperfectly expressed agreement can be reformed. There has to be an underlying agreement, otherwise you don't have anything to which to make reformation.
(Emphasis added.) AMFAC cites several passages from the judge's decision which, it claims, demonstrate that he misunderstood the correct legal standard.[6] We disagree. In our view, the judge was attempting to describe an agreement which is "final" in the sense that no further negotiations are to take place, not "final" in the sense that it is "enforceable and binding." To us it is clear that the trial court rejected reformation because he was not persuaded by clear and convincing evidence that the State and Northwest had ever arrived at any complete mutual understanding as to the geographical scope of concession rights prior to the execution of Supplemental Agreement No. 3.
AMFAC argues, however, that the evidence does establish the existence of a prior agreement with respect to the scope of concession rights. Whether it does is a question of fact and we will reverse the trial court's finding on this issue only if it is "clearly erroneous." Day v. A & G Construction Co., Inc., 528 P.2d 440, 447 n. 16 (Alaska 1974). A finding is "clearly erroneous" if the reviewing court is "convinced, in *1193 a definite and firm way, that a mistake has been committed." Alaska Foods, Inc. v. American Manufacturer's Mutual Insurance Co., 482 P.2d 842, 848 (Alaska 1971).
Our review of the record convinces us that the trial court's finding that there was no prior agreement is not "clearly erroneous." The record discloses two grounds, which the lower court regarded as "totally independent," upon which that finding is based.
The first ground was a lack of faith in Strandberg's testimony. A close reading of the trial transcript reveals several inconsistencies and admitted lapses of memory in Strandberg's remarks. Further, over a decade had elapsed between the time that the Supplemental Agreement was negotiated and the time that Strandberg was called upon to testify. Under these circumstances, we cannot say that the judge's doubts as to whether Strandberg accurately represented the events preceding execution of the agreement were unreasonable, particularly since reviewing courts are constrained to give deference to trial court determinations based on testimonial evidence. See, e.g., Title Guaranty Escrow Services, Inc. v. Powley, 2 Hawaii App. 265, 630 P.2d 642, 645-46 (Haw. App. 1981), Jacobson v. Best Brands, Inc., 632 P.2d 1150, 1152 (Nev. 1981).
The second ground for the judge's finding was documentary evidence presented throughout the trial. Primarily relied upon were the following:[7] (1) a memorandum from Strandberg to the Attorney General's office, dated June 8, 1968, suggesting that Northwest would not accept Exhibit C;[8] (2) leases for land north of the terminal executed before the Supplemental Agreement which contained short-term cancellation provisions and stipulations that no permanent structures be erected;[9] and (3) a site map/master plan for Anchorage International Airport prepared in 1968 which included a "passenger terminal reserve" area north of the then-existing terminal. The trial judge concluded that these documents cast doubt on AMFAC's position in two respects. First, the memo suggested that the parties had not resolved the question of the scope of concession rights at the May meeting, but had instead simply reached a tentative agreement that was to be negotiated further by the parties' attorneys. Second, the leases and the map suggested that at least the State's representatives in the negotiations recognized the possibility *1194 of terminal expansion beyond the area described in Exhibit C, which undermined AMFAC's assertion that both parties assumed that any further expansion would occur within the 1600' diameter circle.
In our view, the trial court could reasonably conclude that the parties to the 1968 negotiations did not agree that concession rights would extend beyond the area depicted in Exhibit C. Thus, its refusal to find a prior agreement to which the written agreement could be reformed was not clearly erroneous.

INTERPRETATION
As an alternative to reformation, AMFAC argues that the trial court should have interpreted the Supplemental Agreement to grant AMFAC concession rights to all passenger terminal expansions. This argument is without merit.
In interpreting the provisions of a contract, it is the duty of the courts to ascertain and give effect to the intentions of the parties. See, e.g. Day v. A & G Construction Co., Inc., 528 P.2d 440, 444 (Alaska 1974); Smalley v. Juneau Clinic Building Corp., 493 P.2d 1296, 1304 (Alaska 1972). In resolving the reformation issue, the trial court found that the parties intended only what was expressed in the provisions of the written instrument. Our determination that this finding was not clearly erroneous is dispositive of AMFAC's contract interpretation claim as well. It would have been logically inconsistent for the trial court to have interpreted the contract to extend concession rights beyond the circle depicted in Exhibit C when it could not find a mutual intention to extend such rights.

ATTORNEY'S FEES
In its cross-appeal, the State challenges the trial court's award of $3,750.00 in attorney's fees, arguing that the amount is insufficient given the approximate 600 hours of attorney's time allegedly expended in defense of the action.
In cases where, as here, a money judgment is not an accurate criterion for determining an award, attorney's fees for the prevailing party may be fixed, at the trial judge's discretion, in an amount "commensurate with the amount and value of legal services rendered." Alaska R.Civ.P. 82(a)(2). The award will be altered on appeal only if it is manifestly unreasonable and amounts to a clear abuse of discretion. Palfy v. Rice, 473 P.2d 606, 613 (Alaska 1970).
The trial court relied on the following factors in determining its award: (1) a defective time-keeping procedure under which the State allotted time in half-hour increments, regardless of the portion of the half-hour actually expended on the case; (2) the limited scope and complexity of the case, including the short period during which the case was pending and the short duration of the trial; (3) the determination that AMFAC had litigated in good faith; and (4) the fact that a substantial portion of the time was spent presenting affirmative defenses on which the State did not prevail. These are proper considerations in determining fee awards. State v. University of Alaska, 624 P.2d 807, 818 n. 18 (Alaska 1981); Alaska State Bank v. General Insurance Co. of America, 579 P.2d 1362, 1369 (Alaska 1978); Palfy v. Rice, 473 P.2d 606, 613 (Alaska 1970). In light of these considerations, the lower court determined that only 250 of the 611.5 hours claimed were reasonably necessary to develop and try the State's case. It further determined that the State's award should be based on 20% of these hours, at the average private billing rate of $75.00 per hour.
In our view, it was well within the trial court's discretion to award the reduced amount according to the method of calculation chosen.
The judgment is AFFIRMED.
CONNOR, J., not participating.
NOTES
[1] Following the trial in this case, AMFAC moved to join Marriott Corporation, AMFAC's successor in interest to the concession rights at issue, as a co-appellant pursuant to Appellate Rule 517(a). This court granted that motion on May 7, 1981.
[2] The State Department of Public Works ("State") acquired the United States' interest under the contract when it assumed operation of the airport in 1959.
[3] Article II of Supplemental Agreement No. 3 had granted Northwest an option to extend the agreement for an additional ten-year period on renegotiated terms.
[4] Article I(1) of the 1980 Concession Agreement ultimately executed incorporated the 1600' diameter circle to define AMFAC's "Concession Limits". Article II of the same agreement, however, contained the following reservation:

The State and the Concessionaire acknowledge that a disagreement exists between them as to the interpretation of Concession Limits as defined in Article I(1) herein. Both parties reserve their respective contentions in this matter and hereby agree to pursue declaratory judgment litigation to resolve the question with all reasonable speed... . For the purposes of Article II, an agreement between the parties to cease litigation or a determination by the Alaska Supreme Court will be considered final.
[5] The meeting was called by Strandberg because a dispute over the validity of the 1961 amendment had arisen after the State attempted to open to public bid concession rights to a new terminal extension then under construction. Because litigation might delay construction of the terminal addition, the State agreed to resolve the dispute by negotiation.
[6] These include the following remarks from the transcript of the minute order:

(1) If they had not drawn up this written agreement .. . would there have been any agreement that could have been enforced? Or did Strandberg by saying, "Okay, you lawyers take it and work out the details," was he in effect saying, well, we have an agreement in principle, but we're not going to have a complete agreement until these details are worked out?
(2) I also am not persuaded, even by a preponderance of evidence, that any binding agreement was reached at the May 29, 1968 negotiating session.
Speaking to the latter point first: Mr. Strandberg testified that he and Mr. Chambers reached an agreement and they left it up to the lawyers to fill in the details. Mr. Strandberg further testified that he expected that there might be a need for further negotiations with respect to some of those details. That is an agreement in principle, it is not a final, binding agreement.
(3) Finally AMFAC has not persuaded me as to its contention that the agreement was made May 29, 1968. The agreement was signed subsequently... . I have very great doubt that there was any agreement that was reached in what was intended to be a final form on May 29, 1968. In any event the proof is not sufficient to meet the clear and convincing requirement.
(Emphasis added.)
[7] The judge stated that he relied to a lesser extent on: (1) the agreement itself; (2) evidence that Northwest never objected when the State communicated its intent to abide by Exhibit C; (3) a letter from the State to the Post Office in 1967 refusing to lease additional land in the terminal reserve area; (4) testimony from Harry Wakefield, Director of the Division of Aviation in 1968, that it would have been "foolhardy" at the time the supplemental agreement was executed to believe that the airport would not expand beyond the boundaries of Exhibit C during the contract term; and (5) testimony from Ed Granger, Planning Engineer with the Division of Aviation in 1968, that Exhibit C was used to define the concession area because the term "airport terminal complex" would have been too ambiguous, since it meant different things to different people.
[8] The Memorandum stated in part:

I am afraid the area outlined by the Division of Aviation as the section to be included within the lease will not satisfy Northwest Airlines. It will be an excellent settlement for the State if Northwest are [sic] willing to agree. However, I do feel that you should have and expect to have some latitude for compromise.
.....
I believe we should discuss this matter and arrive at a compromise position prior to your negotiations with Northwest Airlines' attorneys.
[9] AMFAC argues that the trial court committed reversible error by admitting exhibits pertaining to the leases. The leasing information was irrelevant, AMFAC contends, because it could have had no bearing on the parties' mutual intent. We believe the evidence was relevant, and hence admissible, because it bears on the question of the intent of the State's representatives who participated in the negotiations preceding the execution of Supplemental Agreement No. 3. AMFAC sought to explain the inconsistency between Exhibit C and the rights allegedly agreed to by arguing that both parties assumed that all terminal expansions would occur within the area described in Exhibit C. In our view, the trial court could properly consider the leasing evidence in determining whether both parties were in fact operating on that assumption. See Alaska R.Evid. 401.