Robert W. GROFF and Anna Groff, Appellants,

v.

John P. KOHLER, Barbara E. Kohler, Martin E. Horn, Sandra S. Horn, And Alaska State Employees Federal Credit Union, Appellees.

No. S–6300.

Supreme Court of Alaska.

Aug. 2, 1996.

Barry Donnellan, Fairbanks, for Appellants.

Brett M. Wood, Fairbanks, for Appellees.

Before RABINOWITZ, MATTHEWS, COMPTON, EASTAUGH and FABE, JJ.

## OPINION

COMPTON, Justice.

## I. INTRODUCTION

Robert and Anna Groff (the Groffs) seek to reform a deed to property that they sold to John Kohler and his business associates (Kohler). The Groffs claim that despite the clear intent of the parties to the transaction, an easement was mistakenly omitted from the deed. The superior court ruled against the Groffs in their suit to reform the deed, and they appeal. We affirm.

## II. FACTS AND PROCEEDINGS

The Groffs owned six contiguous lots in Fairbanks, bounded by Cushman Street on the west, Ninth Avenue on the north, and Tenth Avenue on the south. On lots one and two, the Groffs built a commercial office building addressed as 901 Cushman. On lot three they built a second office building addressed as 911 Cushman. Lots 5 and 6 also contain structures, and lot 4 is vacant.

In 1988 the Groffs and John Kohler entered into discussions concerning Kohler's establishment of an insurance business in the building on lots one and two. Although Kohler's purchase of the property was briefly discussed, and the parties signed an earnest money agreement (EMA), in the end they agreed that Kohler would lease the property for thirteen months.

The EMA stated: "Driveways are a common area for 901 and 911 Cushman and 540 10th and 541 9th."[1] After the lease expired, Kohler agreed to buy the property, and the parties signed a second EMA which also contained this "common driveways" clause.

The Groffs intended the "common driveways" clause to create two easements needed to facilitate traffic flow through their property and allow sufficient parking for their building at 911 Cushman. Traffic from Cushman Street enters the lots by means of a driveway which straddles the south end of lot two and the north end of lot three. Consequently, the Groffs desired an easement over the relevant portion of lot two. Additionally, the Groffs dedicated parking spaces on lot four to the office building at 911 Cushman, in order to comply with Borough zoning regulations regarding off-street parking.[2] They claim that exit from these parking spaces can only occur by use of the driveway which is located along the east edge of lots one and two and opens onto Ninth Avenue. Accordingly, the Groffs also intended their sale of the property to be subject to an easement over the east edge of lots one and two.

The sale of lots one and two was closed by the TransAlaska Title Insurance Company ("TransAlaska"). Although TransAlaska's office manager testified at trial that the language of the deed was taken from the EMA, the EMA's "common driveways" clause did not make its way into the deed. TransAlaska first prepared a deed that contained no reference to easements. Anna Groff then requested that a change be made, and the deed was amended—but only to provide that the conveyance of the property from the Groffs to Kohler was "SUBJECT TO AN EASEMENT FOR INGRESS AND EGRESS OVER, ACROSS AND UPON THE COMMON DRIVE AS IT EXISTS ON Lots 2 and 3." TransAlaska's office manager testified that a "clerical error" resulted in the omission of the description of an easement over the east side of lots one and two.

Anna Groff signed the deed, without recognizing that it did not mention an easement over the driveway onto Ninth Avenue across lots one and two. Mrs. Groff also signed an acknowledgement of Title Report, which stated that she approved the legal description contained in the deed.

A year later, Kohler decided to move his business to a larger building, and he entered into negotiations with the Alaska State Employees Credit Union ("the Credit Union") to

---

1. The second EMA added the abbreviation "Ave." at the end. In an apparent typographical error, the November 1994 stipulation between the parties as to undisputed facts reproduced this language but replaced "9th" with "11th."

2. The spaces on lot four are located on the west side of a "rock wall" (also referred to at trial as a "planter box").

sell lots one and two. The Credit Union requested a definition of the width of the easement between lots two and three, which was mentioned in the deed. This prompted Bruce Wammack, Kohler's real estate agent, to contact the Groffs in an attempt to reach an agreement regarding the dimensions of that easement. The Groffs expressed surprise and concern that the deed did not contain an easement across the east side of lots one and two.

Kohler was surprised by the Groffs' claim of an easement, but was willing to recognize the easement across lots one and two as long as the Credit Union would purchase the property subject to that burden. The Groffs asked Wammack to supplement the document he had prepared to record the dimensions of the lot two/lot three easement with a provision stating that an easement also existed over lots one and two. Wammack drafted the document (referred to by the litigants as "the Agreement") with the understanding, shared by Kohler, that its validity was conditioned on its acceptability to the Credit Union.[3] Kohler and the Groffs signed the Agreement, but it was never recorded. The title agency that closed the Kohler/Credit Union sale destroyed the document after learning that the Credit Union would not accede to it.

The day after the signing of the Agreement, the Groffs, Kohler, and a Credit Union representative met on the property in an attempt to settle the dispute regarding the lot one/lot two easement. The Credit Union would not agree to an easement across the east portion of the property. Thus when the Kohler/Credit Union sale was closed immediately thereafter, the Credit Union received a deed with the same language as Kohler's: it spoke only of the lot two/lot three easement. Additionally, Kohler agreed to indemnify the Credit Union for any damages that might ensue from the Groffs' claim that an easement existed.

At some point after the problem was discovered, the Groffs contacted TransAlaska, whose manager agreed that since Kohler's

deed was based on the EMA, it should have included a description of an easement over the eastern portion of lots one and two. TransAlaska prepared a corrected deed, which the Groffs initialled and brought to Kohler. Kohler refused to sign, however, as he had already conveyed the property to the Credit Union.

The Groffs subsequently filed suit seeking reformation of the deed. They testified that both they and Kohler had intended to create an easement over the lot one/lot two driveway. In support of their contention, they cited the EMA's "common driveways" clause, and the never-recorded Agreement between themselves and Kohler.

Kohler testified that he had always understood the Groffs' need for the lot two/lot three easement mentioned in the deed, but said that he "knew nothing about" an easement across the Ninth Avenue driveway on lots one and two until the Groffs raised the subject shortly before his sale to the Credit Union.

Kohler claimed that he did not know what the "common driveways" clause in the EMA meant, and his testimony generally indicated that he had never given the issue much thought. He did allow during cross-examination, however, that the language of the "common driveways" clause seemed to mean that "everybody can use every driveway."

Kohler's testimony indicated that, even at trial, he failed to understand the importance the Groffs attached to that driveway. He thought that the parking spaces next to the planter box were on his property, so he failed to appreciate the Groffs' need for an easement that would allow people parking in those spaces to exit onto Ninth Avenue. Additionally, Kohler disputed the Groffs' account of how traffic moved through the property. He testified that there were three or four possible ways of exiting at the rear of the property; that the Cushman curb cut was used for both ingress and egress; that the Ninth Avenue curb cut was infrequently used; and that "the majority of people [who

---

**3.** Wammack claimed the Groffs were aware of this fact, but the Groffs testified to the contrary.

The trial court made no findings on this issue.

parked on the property] would exit on 10th Street." He therefore disputed their account of the "missing easement's" importance.

The court observed that reformation of a deed is proper when necessary to reflect the actual intentions of the parties, and that the Groffs had the burden of demonstrating by clear and convincing evidence that the easement had been omitted from the deed through a mutual mistake.[4] The court found no mutual mistake that justified reformation; it was "not convinced that it was [Kohler's] intent to provide for an easement [across the east side of lots one and two]." This conclusion stemmed from the court's factual findings that

> Mr. Kohler incorrectly believed that the [six] parking [spaces on the west side of Lot 4 were] on his property [lots one and two], therefore he did not understand the Groffs' need for an easement across Lots 1 and 2. Additionally, in Kohler's experience, the driveway was not used very much. Mr. Kohler relied on the language of the deed and believed that it reflected the parties' intent....

Consequently, the court declined to reform the deed or to grant the Groffs damages. The Groffs appeal.

## III. DISCUSSION

### A. Introduction

■ As a general rule, rights under a contract to convey property are merged into a subsequent deed and thereby extinguished. *See South Utsunomiya Enters. v. Moomuku Country Club*, 75 Haw. 480, 866 P.2d 951, 968 (1994); *Scott v. Curtis*, 103 Or.App. 389, 798 P.2d 248, 250 (1990); *see generally* 2 Milton R. Friedman, *Contracts and Conveyances of Real Property* § 7.2, at 887 (5th ed. 1991).

> Execution and delivery of a deed by the seller ... usually constitute full performance on his part, and acceptance of the deed by the buyer manifests his acceptance of that performance even though the estate conveyed may differ from that

promised in the antecedent agreement. Therefore, in such a case, the deed is the final agreement and all prior terms, whether written or verbal, are extinguished and unenforceable.

*Stubbs v. Hemmert*, 567 P.2d 168, 169 (Utah 1977) (footnote omitted).

However, merger does not occur in cases where "through fraud or relievable mistake the grantee has been induced to accept something different from what the contract required." *Scott*, 798 P.2d at 250 (quotation omitted). Professor Corbin has observed:

> The doctrines of "merger" or "estoppel by deed" have never prevented the reformation of a deed in which the words of description or of conveyance fail to describe correctly or to convey the land or interest that was agreed upon.

3 Arthur L. Corbin, *Corbin on Contracts* § 604, at 631 (1960).

In line with this authority, we have previously held:

> Reformation of a writing is justified when the parties have come to a *complete mutual understanding* of all the essential terms of their bargain, but by reason of mutual mistake ... the written agreement is not in conformity with such understanding....

*AMFAC Hotels v. State, Dep't of Transp.*, 659 P.2d 1189, 1192 (Alaska 1983), *overruled on other grounds by Atlantic Richfield Co. v. State*, 723 P.2d 1249, 1252 (Alaska 1986).

### B. Were the Lower Court's Findings Regarding Reformation Erroneous?

#### 1. Standard of review

■ The trial court in this case correctly noted that the party seeking to avoid merger bears the burden of establishing, by clear and convincing evidence, that the instrument does not conform to the intent of the parties. *Oaksmith v. Brusich*, 774 P.2d 191, 197 (Alaska 1989); *see also Embassy Group v. Hatch*, 865 P.2d 1366, 1371–72 (Utah App.

4. The court correctly held that reformation is generally available only in cases of mutual mistake. As the court explained, reformation is also available in a case of unilateral mistake if the non-mistaken party to the transaction knew of the mistake. That exception was held inapplicable here, however, because the court found that Kohler "did not know [that] the Groffs' intention was to include an easement along the eastern portions of Lots 1 and 2."

1993) (citing *Mabey v. Kay Peterson Constr. Co.*, 682 P.2d 287, 290 (Utah 1984)).

▆ Whether "the evidence does establish the existence of a prior agreement" that justifies the reformation of an instrument "is a question of fact," and will be reversed on appeal only if clearly erroneous. *AMFAC Hotels*, 659 P.2d at 1192. We will deem such a lower court finding clearly erroneous only when we are " 'convinced, in a definite and firm way, that a mistake has been committed.' " *Id.* at 1192–93 (citations omitted).

   2. *The finding that there was no mutual mistake justifying reformation was not clearly erroneous.*

▆ As the trial court noted, reformation is available to the Groffs if they can demonstrate, by clear and convincing evidence, that the easement over lots one and two was omitted from the deed because of mutual mistake.

> Mutual mistake in relation to reformation means a mistake shared by both parties.... The mistake cannot be mutual if the minds of the parties to the instrument did not meet in a common intent.... [T]he evidence of the mutuality of mistake must relate to the time of the execution of the instrument, *and show that at that particular time the parties intended to say a certain thing and by mistake expressed another.*

*Shoulderblade v. Osborn*, 60 Or.App. 12, 652 P.2d 836, 838 (1982) (citing *Frick v. Hoag*, 277 Or. 135, 559 P.2d 879, 881–82 (1977)) (quotations omitted).

▆ Therefore, as we have previously explained, a party will be able to obtain reformation of an instrument only if that party can clearly and convincingly show that "both parties [had] an *identical intention as to the terms to be embodied in [the] proposed written conveyance* ... and [the] writing execut-ed by them is materially at variance with that intention." *Martin v. Maldonado*, 572 P.2d 763, 768 n. 12 (Alaska 1977) (citing *Restatement of Contracts* § 504 (1943)) (emphasis added).[5]

▆ The Groffs offer a three-part argument in an attempt to demonstrate that Kohler shared their intent to create a lot one/lot two easement: (1) they point out that Kohler signed the EMA's and emphasize his trial testimony that the plain language of the EMA's indicated that "everyone can use every driveway;" (2) they observe that the title company that drew up the deed did so by referencing the EMA; (3) they conclude that Kohler intended that the deed provide for an easement over the driveway along the eastern edge of lots one and two.

As Kohler notes, "in substance [the Groffs] argue that these facts, standing alone as a matter of law, establish what [Kohler's] intention was." Kohler rejects the contention that his statement concerning the "common driveways" clause in the EMA inexorably leads to the conclusion that when he signed the deed he intended to reserve an easement across lots one and two. He asserts that there was ample evidence to support the trial court's decision to the contrary, and notes that the lower court's ruling was based on its evaluation of the credibility of the witnesses—a task within the exclusive domain of the trial judge. *Parker v. Northern Mixing Co.*, 756 P.2d 881, 892 (Alaska 1988).

We conclude that the Groffs have not shown the trial court's factual findings to be clearly erroneous. The Groffs were required to prove by clear and convincing evidence that Kohler actually intended that the easement be reserved when he accepted the deed. *Oaksmith*, 774 P.2d at 197; *Shoulderblade*, 652 P.2d at 838. Kohler's testimony at trial, which the trial court accepted, contradicted this contention.[6] While we might have

---

5. See also *Restatement of Contracts (Second)* § 155 cmt. a (1979) ("[R]eformation is available when the parties, having *reached an agreement* and having then attempted to reduce it to writing, fail to express it correctly in the writing.") (emphasis added).

6. In determining the intent of the parties who signed the deed, the trial court was not con-

strained to focus on the EMA to the exclusion of all other evidence. *See, e.g., Janke v. Beckstead*, 8 Utah 2d 247, 332 P.2d 933, 935–36 (1958) (reforming deed based on testimony and actions of parties, even though language of deed accurately reflected contract of sale); *Neal v. Green*, 71 Wash.2d 40, 426 P.2d 485, 487–88 (1967) (reforming deed based on examination of EMA,

reached a different conclusion than the trial court, we cannot say that its decision was clearly erroneous.

### 3. Was reformation required by "the interests of justice"?

■ The Groffs also argue briefly that reformation is justified under a principle set forth in *Fireman's Fund Mortgage Corp. v. Allstate Ins. Co.*, 838 P.2d 790 (Alaska 1992):

[W]e have also recognized a more expansive use of the tool of reformation to allow our courts to alter the terms of a contract when the interests of justice so require.

*Id.* at 797 (citing *Vockner v. Erickson*, 712 P.2d 379 (Alaska 1986)). The Groffs contend that they will suffer more than $260,000 in damages if they cannot obtain a lot one/lot two easement. They argue that under such circumstances, reformation is required under *Fireman's Fund*.

This argument is not mentioned in the trial court's opinion, because the Groffs did not raise it below. They gave testimony regarding damages, but did not argue, as they do here, that because they would allegedly suffer these damages, they should be granted reformation of the deed. To the contrary, they claimed in their complaint that they were entitled to those damages "[i]n the event that reformation *cannot* be had." (Emphasis added). Neither in opening nor in closing arguments did the Groffs contend that the testimony regarding damages *supported* their claim for reformation.[7] Since the Groffs' *Fireman's Fund* argument was not raised below, it cannot be pursued on appeal.

## IV. CONCLUSION

While some testimony at trial supported the Groffs' argument that Kohler intended to create an easement across lots one and two, other portions of testimony contradicted this claim. That the lower court decided to give more credence to the latter testimony cannot be termed clearly erroneous. We therefore affirm the lower court decision.

MOORE, C.J., not participating.

MATTHEWS, Justice, joined by RABINOWITZ, Justice, dissenting.[1]

For the reasons that follow I conclude that the superior court clearly erred in finding that there was no mutual mistake.

I begin with the earnest money agreements (EMA's). Both EMA's contained language specifying that "[d]riveways are a common area" for the buildings on the Groffs' property. Both parties signed both EMA's, and Anna Groff apparently read both EMA's aloud to Kohler before he signed them. Kohler testified at trial that easements did not particularly concern him during the term of his lease, and that when he signed the second EMA he did not fully understand the "common driveways" language.[2] Nevertheless, he later testified that

witness testimony and demeanor, corroboration from contemporary records, and parties' subsequent conduct. Indeed, to focus solely on the language of the EMA would have been an errant approach to the inquiry, since the court's task was to determine the parties' intent at the time the deed was executed. *Shoulderblade*, 652 P.2d at 838.

7. In their opening argument, the Groffs' counsel merely paraphrased their complaint, explaining: "If reformation is not available to the Groffs, they will argue that they have sustained damages." The whole of the Groffs' closing argument regarding damages testimony was this statement by their counsel:

I'm not going to waste time talking about the damages aspect, Your Honor. I think there's a prima facie case for reformation here but the Groffs testified about why the building would be useless if they didn't have these parking

spaces because they're maxed out in their zoning for parking. And there was no testimony contradicting that whatsoever, except now that [opposing counsel] argues ["W]ell, that's not very sensible.["]

1. To facilitate the reader's understanding of this case, I have attached as Appendix A a diagram of the property involved.

2. He testified:

What I recall is it said something like driveways are common. And ... I'm not familiar with what that means.... I know what an easement is.... I'm familiar with the term of a utility easement or a natural gas easement or this type of thing, but I don't know what "driveways are common" means.

Kohler testified that he understood the meaning of "an easement for ingress and egress over, across, and upon the common drive as it exists

he understood the language to mean "that everybody can use every driveway or something like that."

Kohler argues, and the trial court apparently agreed, that he could not have understood the need for an easement over the driveway along the eastern edge of Lots One and Two because he mistakenly thought that the parking spaces to the west of the planter box were contained within those lots, which he later bought. The logic of .this escapes me. Kohler never contradicted the testimony that the spaces by the planter box were dedicated to 911 Cushman, and he admitted that he was told that he could use the spaces for "overflow" parking. Even if he *had* owned the property up to the planter box, then, he had to know that the parking spaces to the west of the planter box were dedicated to 911 Cushman, and that cars parked there could exit only onto Ninth Avenue. The ownership of the land on which the parking spaces were located does not affect the existence of an easement over the driveway.

I next look to the deed. The deed was prepared by TransAlaska, which was apparently chosen to act as closing agent by the bank through which Kohler obtained financing. At the time of the transaction, Bill Standard was the office manager for Trans-Alaska. He testified that the deed's description of the easements was taken from the earnest money agreement, and that "through clerical error, there was an easement left off of the subject Lot One."

Finally, and most importantly, I consider the physical characteristics of the area itself. Kohler was aware of the orientation of the

parking spaces abutting the planter box and was aware that cars in those spaces had to back out and exit onto Ninth Avenue. Kohler never testified that there were no arrows indicating the traffic flow, and never contradicted Anna Groff's testimony regarding directional arrows and zoning restrictions.[3] While he testified that some cars exited onto Cushman Street from Lot Four, and Anna Groff also testified that cars "occasionally go against" the arrows, there is no evidence to contradict the Groffs' claim of traffic restrictions for use of the curb cuts or the testimony that the cars parked at the planter box could only exit at Ninth Avenue.

All of the evidence points to a mistake in the preparation of the deed by TransAlaska following an agreement between the Groffs and Kohler to convey the property subject to an easement on the eastern ten feet of Lots One and Two. Kohler himself never actually testified that there was not a mistake. He may not have initiated the reservation of the easement, and he may not have wanted the easement; but when he agreed to purchase the property, he agreed to purchase it subject to the easement. The deed failed to reflect that agreement only by mistake of the title company.

I conclude that the trial court's determination that Kohler did not intend for there to be an easement over the driveway leading to Ninth Avenue on Lots One and Two at the time he purchased the property from the Groffs was clearly erroneous, and that the Groffs were entitled to reformation of the deed.

on Lots 2 and 3, Block 109," but did not understand the meaning of "driveways are a common area for 901 and 911 Cushman."

**3.** Kohler testified that he could not recall "seeing a bunch of arrows" but he mentioned "the possi-

bility of a line on the Cushman Street" driveway showing the direction of traffic.