Stan A. OAKSMITH III and Bonnie L. Oaksmith, Husband and Wife, Appellants and Cross–Appellees,

v.

Daniel A. BRUSICH and Alice R. Brusich, Husband and Wife, Appellees and Cross–Appellants.

Nos. S–2377, S–2378.

Supreme Court of Alaska.

May 12, 1989.

**192**

W. Clark Stump, Stump & Stump, Ketchikan, and Gregory J. Wall, Wall & Hinrichs, Seattle, Wash., for appellants and cross-appellees.

Bruce O. Davies, Ketchikan, and Albert Hanan, Hanan and Hanan, Seattle, Wash., for appellees and cross-appellants.

Before MATTHEWS, C.J., and
RABINOWITZ, BURKE, COMPTON
and MOORE, JJ.

## OPINION

MOORE, Justice.

These cross appeals arise out of a family dispute over the terms of a lease of marina property and claims of business interference and intentional infliction of emotional distress against Daniel Brusich, co-owner of the marina and father of Bonnie Oaksmith, the co-lessee of the marina property.

### I.

In 1979, Daniel and Alice Brusich (the Brusiches) owned and operated a marina north of Ward Cove in Ketchikan, Alaska. In March of 1979, the Brusiches subdivided the property into two tracts, tracts A and B. They then entered into a transaction with Harlan Heaton involving a 30–year renewable lease of tract A of the marina property to Heaton and a memorandum of sale to Heaton of the personal property of the marina.

In November 1980, Heaton advised the Brusiches of his desire to terminate his agreements with them and to return the marina. Bonnie Oaksmith, the only child of the Brusiches, and Stan Oaksmith, her husband, upon learning of Heaton's desire to vacate the marina, approached the Brusiches with the request that they be allowed to take over the marina. The parties met in the Brusiches' dining room where Alice dictated, and Bonnie typed, an agreement which states, in pertinent part:

> Stan and Bonnie Oaksmith, PTR., Air Marina have on this date of November 15, 1980 consented to assume the purchase agreement and lease agreement to which Harlan Heaton, DBA Refuge Cove Marina agreed to return to the Brusichs.
>
> It is agreed Air Marine Company will take possession of the property and assets December 1, 1980.

The Brusiches and Stan and Bonnie Oaksmith (the Oaksmiths) all signed the above agreement.

Heaton subsequently changed his mind about his decision to vacate the marina and refused to leave by December 1, 1980. On December 19, 1980, the Brusiches and Heaton entered into a termination agreement.

After the signing of the termination agreement, the Brusiches commenced a lawsuit against Heaton alleging that he had breached various provisions of the termination agreement. Heaton filed an answer and counterclaim to the Brusiches' complaint, and he later filed a third-party complaint against the Oaksmiths, alleging that they had assumed possession of the marina. In answer to Heaton's third-party complaint, the Oaksmiths filed a pleading admitting that their possession of the marina was based upon the November 15 assumption agreement. The Brusich–Heaton litigation was settled on February 10, 1981 with Heaton receiving a payment of $59,000 and relinquishing all rights to the marina property.

On January 1, 1981, the Oaksmiths moved onto the marina property, paying rent in the sum of $5,000,[1] and thereafter operated the marina. Alice Brusich helped the Oaksmiths with the marina's bookkeeping. Daniel Brusich assisted with the operations at the marina.

However, after several months friction developed between the Brusiches and the Oaksmiths, in particular between Daniel Brusich and Bonnie Oaksmith. Daniel Brusich, who retired in 1979, spent much of his time at the marina. His residence is located on a hill adjacent to and above the marina, from which point he often watched the marina through binoculars.

According to the testimony of employees and customers of the marina, on many occasions Daniel Brusich told them that the marina was not being run properly, tried to direct their actions in ways contrary to the direction of the Oaksmiths, and referred to the Oaksmiths using profane and insulting

---

1. These payments consisted of two separate checks: one for $3,015 designated as "lease payment," and one for $2,000 designated as "note payment." Fifteen dollars was included in each rent check to pay the Borough rent tax.

language in front of customers and employees. He would wander around the marina muttering to himself and yelling that the Oaksmiths were "destroying" the marina. He put up "For Sale" signs at the marina entrance to make people falsely believe that the marina was for sale and going out of business. Bonnie Oaksmith testified from her diary entries as to Daniel Brusich's contacts with potential subcontractors and customers, who wished to lease portions of the marina, telling them they could not lease space in the marina. Daniel Brusich also had his attorney send protest letters to the Army Corps of Engineers regarding a float permit issued to the Oaksmiths alleging that he had not received notice of the permit.

On several occasions, Daniel Brusich engaged in bizarre behavior while directing his anger at the Oaksmiths. A marina employee testified that on one occasion he lay on the floor throwing a temper tantrum like a small child. There was also testimony by Ralph Yetka, the marina manager, that in one confrontation with Bonnie Oaksmith, Brusich pounded his head on the floor while pulling out his own hair. At another point, Mr. Brusich had an argument with Bonnie Oaksmith, causing her to shut down the marina for two and a half days.

The conflict between Daniel Brusich and his daughter culminated on July 12, 1983. On that date, the *Ketchikan Daily News* published a newspaper article featuring Bonnie Oaksmith and her work at the marina. Brusich telephoned his daughter and expressed displeasure with the article. Thereafter, Bonnie Oaksmith got in her car with her 14–year old son and was driving up the hill when Dan Brusich's car appeared from the opposite direction. According to Bonnie Oaksmith's testimony, Mr. Brusich appeared, coming down the road at a very fast rate of speed, veered into her side of the road and skidded into the front of her car. Bonnie testified that "he looked very angry" and that "his fists were flying and his mouth was working, and it looked like he was fighting to get the door open." She was "terrified" and "floorboarded" her car pushing Brusich's

car up the hill until it hit an obstruction at which point she drove off toward the new highway. Both parties were essentially estranged after the collision.

Gerry Clearwater testified that Mrs. Oaksmith was very upset and frightened by these confrontations with Dan Brusich. She also testified that Mrs. Oaksmith suffered a seizure while at work in late 1983.

On November 30, 1983, the Brusiches sent the Oaksmiths notice of an increase in rent to $5,000 pursuant to the terms of the Heaton lease assumed in November of 1980. The Oaksmiths responded in a letter from their attorney that they did not intend to pay any increase.

On May 21, 1985, the Oaksmiths filed suit against the Brusiches, alleging that they had entered into an agreement, partly oral and partly written, for the purchase of both tract A and B of the marina property from the Brusiches. They further alleged that this agreement was later modified to include Ellis Island, a small island fronting on the marina, which had been purchased by the Brusiches sometime after November 15, 1980. The complaint alleged that "[a] portion of the agreement ... was for the assumption of a lease of a portion of the property.... The lease was originally between defendants and Harlan W. Heaton, and called for an option to purchase the property and an option to renew the lease."

The Brusiches denied the Oaksmiths' claims and counterclaimed for ejectment of the Oaksmiths from the marina property for their failure to pay the rentals past due, for damages for wasting assets, for damages for their failure to pay past due property taxes, and for the return of the remaining assets covered by the Heaton Memorandum of Sale.

The case was tried before Judge Carpeneti without a jury, in Ketchikan on November 17–21, 1986. On July 8, 1987, the court issued its judgment. The court found that the Oaksmiths had failed to prove that they had entered into a contract with the Brusiches that was materially different from the written agreement of November 15, 1980, except as to the dates when lease

payments would increase. The court found that while there was conflicting testimony, the most credible testimony was that the parties agreed that the Oaksmiths would be entitled to start lease payments as though starting at the first month rather than at the twenty-third month—as would have been the case if they stood in Heaton's shoes. The court concluded that the lease only included tract A and not tract B or Ellis Island.

The court found that "the unwarranted and continued harassment and attacks by Daniel Brusich on the Oaksmiths and their operation of the marina ... thwarted its full development, and constituted an intentional interference with economic relationships." The court awarded damages of $30,000 ($5,000 per year) as a result of Daniel Brusich's interference with the Oaksmiths' business relationship with Steve Shrum dating from 1982 through 1987. The court noted that the Oaksmiths had failed to offer evidence of any other losses resulting from Mr. Brusich's interference.

The court also awarded Bonnie Oaksmith $20,000 for the intentional infliction of emotional distress caused by Daniel Brusich's "extreme and outrageous conduct." [2] The court also held Mr. Brusich liable to the Oaksmiths for punitive damages as a result of his "intentional and outrageous conduct." The court awarded $25,000 to the Oaksmiths for punitive damages and issued a permanent injunction against Mr. Brusich prohibiting him from interfering in the business affairs of the Oaksmiths in the future. Both sets of parties appealed.

## II.

### A. *Assumption of the Heaton Lease*

The Oaksmiths contend that the court erred in finding that the contract for the lease of the marina consisted solely of the agreement of November 15, 1980 assuming the Heaton lease. They also argue that the court erred in its finding that only two modifications of the terms of the Heaton lease were agreed to by the parties. The court found that the Heaton Lease had been modified as to the beginning dates for the lease payments and by an added provision that the lease could only be modified by a writing.

The Oaksmiths contend that their agreement with the Brusiches covers tract A, tract B, and Ellis Island at a rent of $5,000 a month for 60 years, or until both Brusiches had died, at which point Bonnie Oaksmith was to inherit the property.

■ We initially note that these issues are properly reviewed under the clearly erroneous standard. While this court may review de novo a trial court's interpretation of a contract in which the underlying facts are undisputed,[3] this case involves a substantial number of disputed material facts concerning the lease agreement. The primary contention of the Oaksmiths goes not to the court's application of the doctrine of reformation or specific performance but to the court's findings of fact concerning the intent of the parties when forming the contract and the modifications made to the Heaton lease. Consequently, the contract issues raised by the Oaksmiths are properly reviewed under the clearly erroneous standard of review applicable to factual findings of the trial court.[4]

■ The agreement of November 15, 1980 between the Oaksmiths and the Brusiches states:

WHEREAS, Harlan Heaton ... advised ... [the Brusiches that] Mr. Heaton would vacate on November 30, 1980, and WHEREAS, the Brusichs have the right to re-lease the property and re-sell the inventory and assets, we have entered into the following agreement.

---

**2.** The court found that Mr. Brusich's actions, "while annoying and harassing to Mr. Oaksmith, were not as serious as those actions taken against Mrs. Oaksmith, and they did not cause Mr. Oaksmith the type of 'severe' emotional distress which the law requires."

**3.** *See Norton v. Herron,* 677 P.2d 877, 880 (Alaska 1984); *Peters v. Juneau–Douglas Girl Scout Council,* 519 P.2d 826, 832 (Alaska 1974).

**4.** *Fairbanks North Star Borough v. Tundra Tours, Inc.,* 719 P.2d 1020, 1024–25 (Alaska 1986).

Stan and Bonnie Oaksmith, PTR., Air Marine have on this date of November 15, 1980 consented to assume the purchase agreement and lease agreement to which Harlan Heaton, DBA Refuge Cove Marina agreed to return to the Brusichs. On appeal, the Oaksmiths contend that this agreement is ineffective because it is in actuality a novation agreement made without the assent of Heaton. This contention is without merit.[5]

■ The terms of the November 15 agreement clearly indicate an agreement by the Oaksmiths to "assume the purchase agreement and lease agreement" of Heaton. The Oaksmiths, however, contend that it was never the intent of the parties to enter into an assumption of the Heaton lease and initiate a lessor-lessee relationship. Instead, the Oaksmiths characterize the November 15, 1980 agreement as litigation "ammunition" which was to be used against the former lessee, Heaton.

The trial judge's conclusions concerning the terms of the contract are clearly supported by the evidence presented at trial.

■ As to the issue of whether the Oaksmiths assumed the Heaton lease, the court relied on the assumption agreement itself, the Oaksmiths' answer to Heaton's third-party complaint in which they admitted that their possession of the marina was based on the assumption agreement,[6] and the Oaksmiths' own admission in their complaint that "a portion of the agreement . . . was for the assumption of a lease of a portion of the property." The fact that Daniel Brusich was allowed to use marina equipment does not seem unusual considering the family context in which the parties operated and, therefore, does not justify a conclusion that the parties were not in a lessor-lessee relationship.

The Oaksmiths refer to a number of instances in which the Brusiches did not enforce the express terms of the Heaton lease as evidence that the lease was never intended to be applied to them. These waivers of the express terms of the lease include a five-month delay in requesting the scheduled rent increase, and the Brusiches not insisting on prior approval of all improvements and subleases.

The court was justified in refusing to rely on this evidence. The Heaton lease contained a provision stating that the Brusiches' failure to insist upon strict performance of any of the lease covenants would not waive or relinquish any such covenants. Consequently, the fact that the Brusiches did not strictly enforce the lease terms when the relations between the two families were good does not estop them from enforcing those terms after their relations had broken down.

As to any modifications of the Heaton lease, the testimony of Ralph Yetka, George Toulouse, Fred Miller, and Alice Brusich support the trial court's findings that the parties only agreed on two modifications of the lease. While the Oaksmiths testified as to their understanding of their oral contract with the Brusiches, this testimony was not corroborated by any other witness.

---

5. A novation is a substitute contract that includes as a party one who was neither the obligor nor the obligee of the original duty. Restatement (Second) of Contracts § 280 (1981). A novation discharges the original duty, just as any other substitute contract does, so that the breach of the new duty gives no right of action on the old duty. *Id.* comment b. The agreement of November 15 did not seek to discharge Heaton from his lease, nor did it seek to bind Heaton in any way.

Nor was it necessary to have Heaton consent to such a novation. The Second Restatement of Contracts states that "[a]lthough all parties usually assent to a novation, a novation is possible without the assent of the obligor of the original duty." *Id.* comment c. *See also* 15 S.

Williston, *Williston on Contracts* § 1870, at 617 (3rd ed. 1972). Therefore, even if the agreement had manifested an intent to discharge Heaton of his duties, which it did not, Heaton's assent to such novation would not be necessary.

6. The pleading stated:

Oaksmiths presently possess the real estate described in the sale and lease agreement dated November 15, 1980 pursuant to that agreement, except as to subsequent modifications of that agreement between themselves and the Brusiches. In particular, the Brusiches were unable to deliver possession on December 1, 1980 and the agreement was modified between the parties to adjust for that fact.

As to the boundaries of the lease, the court found that the lease consisted solely of tract A of the marina property. Stan Oaksmith testified that he walked the property with Daniel Brusich at the beginning of the lease and that Mr. Brusich indicated the property included tract A and B. Stan Oaksmith also testified to the Oaksmiths' subsequent use of tract B. This evidence of permissive use of tract B in the context of the family nature of the business, taken together with Stan Oaksmith's testimony as to his conversations with Daniel Brusich does not provide sufficient justification for deviating from the express terms of the Heaton lease. Accordingly, we conclude the judge's finding of fact that the lease consisted solely of tract A, excluding the Brusich home, is clearly supported by the evidence.

## 1. Reformation

The Oaksmiths contend that the trial court erred in not reforming the lease contract so as to conform with the oral agreements of the parties. The trial court rejected the Oaksmiths' request and reformed the contract only as to the new starting date for the rent schedule.

Reformation is a means of correcting mutual mistakes and of conforming a contract to the clear intention of the parties. *Stewart–Smith Haidinger, Inc. v. Avi–Truck, Inc.*, 682 P.2d 1108, 1113 n. 3 (Alaska 1984); *Riley v. Northern Commercial Co.*, 648 P.2d 961, 969 (Alaska 1982). In order to obtain reformation of an agreement, the court must find, based on "clear and convincing" evidence, that reformation is warranted, and it must determine what the precise terms of the agreement were. *AMFAC Hotels & Resorts v. Department of Transp.*, 659 P.2d 1189, 1192 (Alaska 1983), *overruled on other grounds, Atlantic Richfield Co. v. State of Alaska*, 723 P.2d 1249, 1252 (Alaska 1986).

In light of the above discussion of the court's findings regarding the lease agreement, it is clear that the trial court did not err in holding that the Oaksmiths had not presented clear and convincing evidence that the parties' intention was anything other than the agreement to assume the Heaton lease.

## 2. Specific Performance

The Oaksmiths argue that the court erred by refusing to grant specific performance of their oral agreements with the Brusiches. In *Hall v. Add–Ventures, Ltd.*, 695 P.2d 1081, 1087 (Alaska 1985), we noted:

> It is generally held that specific performance is an equitable remedy, the granting or withholding of which rests in the discretion of the trial court. The granting of specific performance presumes the existence of a valid contract.

(Citations omitted). Since the Oaksmiths failed to prove the existence of an oral contract other than the Heaton lease assumption, the trial court did not err in denying specific performance.

We affirm the trial court's rulings on the Oaksmiths' assumption of the Heaton lease and the award of back rent and property taxes to the Brusiches.

## B. *Intentional Interference in Economic Relations Claim against Daniel Brusich*

The Brusiches contend that the trial court's award of $30,000 to the Oaksmiths for Daniel Brusich's interference with their business dealings with Steve Shrum is clearly erroneous since the Oaksmiths failed to present sufficient evidence of any interference by Brusich with the Oaksmiths' business relations with Shrum. We agree.

In *Ellis v. City of Valdez*, 686 P.2d 700, 706–08 (Alaska 1984), this court first recognized the tort of intentional interference with prospective economic advantage. Under section 766B of the Restatement (Second) of Torts:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for pecuniary harm resulting from the loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third party not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

While the court did not precisely define the required elements of the tort, this court has set forth the elements of the related tort of intentional interference with contractual relations. In *Knight v. American Guard & Alert, Inc.*, 714 P.2d 788, 793 (Alaska 1986), we set forth the following elements for the tort of intentional interference with contractual relations:

(1) a contract existed, (2) the defendant ... knew of the contract and intended to induce a breach, (3) the contract was breached, (4) defendant's wrongful conduct engendered the breach, (5) the breach caused the plaintiff's damages, and (6) the defendant's conduct was not privileged or justified.

(Citation omitted). Since the tort of interference with contractual relations is merely a species of the tort of interference with prospective economic advantage,[7] we adopt a similar test in this case. However, as we noted in *Ellis*, the tort of intentional interference with prospective economic advantage "protects both continuing business or customary relationships not amounting to formal contracts, and prospective business or contractual relations which, absent interference, would culminate in pecuniary benefit to the plaintiff." 686 P.2d at 707 (footnote omitted). As a result, the issues presented in this case are whether there is sufficient evidence that: 1) a prospective business relationship existed between the Oaksmiths and Shrum, 2) Daniel Brusich knew of the prospective relationship and intended to prevent its fruition, 3) the prospective business relationship did not culminate in pecuniary benefit to the Oaksmiths, 4) Daniel Brusich's conduct interfered with the prospective relationship, 5) the interference caused the Oaksmiths' damages, and 6) Daniel Brusich's conduct was not privileged or justified.

7. *See Ellis*, 686 P.2d at 707 n. 16 (citing *Buckaloo v. Johnson*, 14 Cal.3d 815, 122 Cal.Rptr. 745, 537 P.2d 865 (1975)).

The evidence presented at trial as to the Oaksmiths' relationship with Shrum and Daniel Brusich's interference consisted of testimony by the Oaksmiths themselves. Steve Shrum was never called as a witness and Dan Brusich was not questioned about his dealings with Shrum.

Liberally construed, the testimony established that the Oaksmiths had a prospective business relationship with Shrum and that Shrum did not enter into the business arrangement after Daniel Brusich spoke with him. The trial court in its findings of fact stated:

Beyond the loss of a business opportunity worth approximately $5,000 per year,[5] the Oaksmiths did not show that their business was directly damaged by Mr. Brusich's actions.

5. Stan Oaksmith had negotiated successfully for Steve Schrumm to drive pilings in the property and to locate a hanger there on the property rented from the marina. Mr. Oaksmith calculated the value of the arrangement to be worth $5,000 annually to the marina. After Mr. Brusich spoke to Mr. Schrumm about the planned enterprise, Mr. Schrumm withdrew from it.... [M]r. Oaksmith's testimony of the value of the lost business opportunity stands uncontroverted.

Neither the evidence presented at trial nor the court's findings of fact establish the essential elements of the tort of intentional interference with prospective economic advantage as to the Shrum claim. No findings were made as to the contents of Brusich's conversations with Shrum, whether these conversations were wrongful conduct or whether Brusich's wrongful conduct actually induced Shrum not to enter into the business relationship. Accordingly, we reverse the trial court's award of damages for intentional interference with prospective economic advantage.[8]

C. *Should Separate Damages for Intentional Interference with the Lease Contract Have Been Awarded?*

The Oaksmiths argue that the judge should have awarded damages for

8. We need not reach the Brusiches' additional contentions that the evidence presented on the business interference claim constituted inadmissible hearsay or that Mr. Brusich's actions were privileged.

Daniel Brusich's breach of the implied covenant of good faith found in all contracts. While Judge Carpeneti found that Daniel Brusich frustrated the purpose of the lease contract, he noted that the Oaksmiths failed to prove damages beyond the Shrum claim. The Oaksmiths argue that the court should have used the diminution in the value of the business' good will as a measure of damages for this breach. The court's findings of fact contradict the Oaksmiths' contention. As the court noted, the Oaksmiths "achieved notable success in their operation of the marina. Gross income of the marina climbed steadily every year from 1981–1983 (from below $300,000 in 1981 to $360,000 in 1982 and to $372,000 in 1983)." While Daniel Brusich's actions thwarted the marina's full development, the Oaksmiths do not cite to any evidence to indicate destruction of the original good will included in the lease agreement. We therefore conclude that the superior court was correct in not awarding separate damages for the breach of the covenant of good faith and fair dealing.

### D. Intentional Infliction of Emotional Distress Claim

Both parties challenge the trial judge's award of damages to Bonnie Oaksmith for the intentional infliction of emotional distress by Daniel Brusich. The Brusiches first argue that Bonnie Oaksmith's claims are barred by the two-year statute of limitations contained in AS 09.10.070. Second, they contend that Daniel Brusich's actions were not so "extreme and outrageous" as to justify a finding of intentional infliction of emotional distress and that his actions were privileged. The Oaksmiths, on the other hand, contend that the damages awarded were insufficient.

The Brusiches argue that the trial court erred in rejecting its statute of limitations defense as untimely. The Oaksmiths argue that claims are not barred since the acts were a continuing trespass and part of a continuing attempt by Daniel Brusich to inflict emotional distress on his daughter. In its order denying the Brusiches' motion for reconsideration, the trial court noted that the defendants had not raised the issue in a timely manner since it violated the court's scheduling order. As a separate ground of decision, the court noted that "the tort claim rested upon a series of acts which showed a pattern of conduct on the part of Daniel Brusich. Because there was no doubt that some of those acts occurred within the statute of limitation," the court held that Bonnie Oaksmith was entitled to relief.

In *Blake v. Gilbert*, 702 P.2d 631, 639 (Alaska 1985), we held that absent prejudice to the opposing party, a defending party may, at any time, move for summary judgment on the basis of the statute of limitations. In *Barrett v. Byrnes*, 556 P.2d 1254, 1255 (Alaska 1977), this court found that the defendant had waived her statute of limitations defense by not raising it in the pleadings, or by motion, or in her opening statement at trial. In this case, the Brusiches raised the statute of limitations in their pre-trial memorandum and in their opening remarks. The trial judge inquired into the issue before closing arguments and each party addressed substantive arguments on the merits of the defense to the court. Because the merits of the issue were raised by both parties at trial, under Alaska Rule of Civil Procedure 15(b) the issue should be considered tried by the implied consent of the parties and, therefore, considered part of the pleadings.[9]

As to the substance of the statute of limitations claim, it is evident that Dan Brusich's acts against Bonnie Oaksmith before May 21, 1983 are barred by

9. In construing the relationship between federal rule 15(b) amendments conforming the pleadings to the evidence at trial and federal rule 16 governing pre-trial orders, Professor Moore notes that "Rule 16 should be read in the light of Rule 15(b)." 3 J. Moore, *Moore's Federal Practice* ¶ 15.13[1] (2d ed. 1985). He cites a number of cases where there was implied consent to try issues within the meaning of Rule 15(b) that acted to modify the pretrial order. *Id.* at 15.-13[1] n. 11. Thus, the fact that the Brusiches' motion for summary judgment on the statute of limitations issue was untimely under the judge's pretrial order does not prevent the issue from being tried by implied consent pursuant to rule 15(b).

the statute of limitations.[10] While the court discussed a number of these time-barred acts in its findings of fact, the most outrageous of Brusich's acts, the vehicle incident, did occur within the limitations period. Therefore, we conclude that this act was properly considered by the trial court.

Secondly, the Brusiches argue that, as a matter of law, Daniel Brusich's actions were not so extreme and outrageous as to justify a finding of intentional infliction of emotional distress. In *Richardson v. Fairbanks North Star Borough*, 705 P.2d 454, 456 (Alaska 1985), we adopted the Restatement (Second) of Torts' elements of intentional infliction of emotional distress. The Restatement notes:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 comment d.[11]

Judge Carpeneti relied on Daniel Brusich's "hostile and bizarre" actions in his confrontations with Bonnie at the marina office and the vehicle collision to justify his award of damages for intentional infliction of emotional distress.

■ The Brusiches argue that courts must be hesitant in imposing liability for intentional infliction of emotional distress in the context of intra-family relations. This argument ignores the fact that under the Restatement, only outrageous acts that are utterly intolerable by society are actionable. Consequently, there is little danger that family disputes or arguments of a more common variety will constitute actionable torts. Daniel Brusich's conduct toward his daughter was not simple harassment, criticism or parental anger. His actions were characterized by the judge as "without rational explanation," "bizarre," "preposterous" and "irrational." We agree with the trial court and affirm its decision to impose liability for intentional infliction of emotional distress.

■ The Oaksmiths argue that the court erred in only awarding $20,000 for the intentional infliction of emotional distress claim. Their argument is without merit. The Oaksmiths do not point to any particular evidence to justify a higher amount of damages other than arguing that the amount is not enough to offset the contract award to Brusich and therefore is "essentially a reward to the tortfeasor."

While medical evidence is not required to establish damages for intentional infliction

---

**10.** The court held that Daniel Brusich's actions constituted a pattern of conduct analogous to the continuing trespass or nuisance situations discussed in *Blake*, 702 P.2d at 639–40. The Brusiches contend that each of Brusich's acts was a separate incident and not part of a course of conduct. The parties and the court misconstrue *Blake*. Regardless of whether one views these acts as continuing or separate, the acts prior to May 21, 1983 cannot form the basis of any damages for intentional infliction of emotional distress. Under theories of continuing trespass or nuisance, each harmful act constitutes a new cause of action for statute of limitations purposes and, therefore, the accrual of a cause of action is not measured from the date of the initial trespass so as to bar the entire action. 51 Am.Jur.2d *Limitation of Actions* § 87 (1970); 58 Am.Jur.2d *Nuisances* § 132 (1971). However, while later continuing acts may prevent the running of the statute of limitations on the claim, damages cannot be recovered for the initial time-barred acts. 58 Am.Jur.2d *Nuisances* § 132 n. 3 (1971).

**11.** *See also Croft by Croft v. Wicker*, 737 P.2d 789 (Alaska 1987).

of emotional distress,[12] the Oaksmiths did not present any evidence of Bonnie's emotional distress other than the testimony of her co-workers and her husband. We conclude that the Oaksmiths have not demonstrated that the trial judge abused his discretion in awarding only $20,000.

In conclusion, we affirm the award of $20,000 to Bonnie Oaksmith for the intentional infliction of emotional distress claim.

### E. *Punitive Damages*

■ The trial court awarded $25,000 in punitive damages to Stan and Bonnie Oaksmith for Daniel Brusich's intentional and outrageous conduct. The court's decision does not allocate the award between Stan and Bonnie Oaksmith or between the intentional infliction of emotional distress claim and the business interference claim. While we reversed the award of damages for the intentional interference with the Shrum business relationship, we note that the court made a finding of nominal damages to the Oaksmiths for Daniel Brusich's intentional interference with the marina business.[13] This finding was clearly supported by evidence of Brusich's interference with marina customers, employees and harassment of Bonnie Oaksmith in her operation of the marina.

■ In *Haskins v. Shelden*, 558 P.2d 487, 493 (Alaska 1976), this court quoted McCormick for the proposition that in some cases substantial punitive damages may be awarded even though actual losses have not been proven with sufficient definiteness to support other than nominal damages.[14] We conclude that the finding of nominal damages for the intentional interference with prospective economic advantage claim is a sufficient basis for an award of punitive damages to Stan Oaksmith. The award of punitive damages to Bonnie is premised both on her intentional infliction of emotional distress claim as well as the business interference claim. We conclude that the court's finding as to Brusich's intentional and outrageous conduct is supported by the record and we therefore affirm the award of punitive damages.

### F. *The Trial Court's Failure to Render a Decision Within Six Months of the Trial*

■ The Oaksmiths contend that a new trial should be granted since the judge failed to render a decision within six months as required by AS 22.10.190.[15] The Oaksmiths contend that they were prejudiced by the trial court's delay of almost nine months in rendering an opinion since the effect of the testimony was dulled by the passage of time. The Oaksmiths' contentions are without merit.

The statute simply does not provide for the remedy of a new trial. The statute governs the payment of judicial salaries and contains its own exclusive remedy: the withholding of judicial salaries. Buttressing this conclusion are decisions by other jurisdictions holding that time limits for the issuance of findings of fact are directory and not mandatory, and that the mere

---

**12.** *See Richardson*, 705 P.2d at 457 n. 6.

**13.** The court found that "the unwarranted and continued harassment and attacks by Daniel Brusich on the Oaksmiths and their operation of the marina 'robbed their enthusiasm' in running the marina, thwarted its full development, and constituted an intentional interference with economic relationships."

**14.** *See* McCormick, *Damages* § 83 (West 1953); *see also Carida v. Holy Cross Hosp., Inc.*, 427 So.2d 803, 807 n. 7 (Fla.App.1983); *Davis v. Gage*, 106 Idaho 735, 682 P.2d 1282, 1286 (App. 1984); *Westway Trading Corp. v. River Terminal Corp.*, 314 N.W.2d 398, 404 (Iowa 1982); *Fowler v. Mantooth*, 683 S.W.2d 250, 252 (Ky.1984);

*Herberholt v. dePaul Community Health Center*, 625 S.W.2d 617, 624 (Mo.1981); *Butcher v. Petranek*, 181 Mont. 358, 593 P.2d 743, 746 (1979); *Shugar v. Guill*, 304 N.C. 332, 283 S.E.2d 507, 509 (1981).

**15.** AS 22.10.190(b) provides:

A salary warrant may not be issued to a superior court judge until the judge has filed with the state officer designated to issue salary warrants an affidavit that no matter referred to the judge for opinion or decision has been uncompleted or undecided by the judge for a period of more than six months.

lapse of time is not enough to require reversal.[16] We conclude that this statute governing judicial salaries should not be construed as conferring a right to a new trial for the failure to render a decision within six months.

### G. *Attorney's Fees*

The court ruled that an award of attorney's fees to either set of parties was inappropriate since "[e]ach side has prevailed in significant areas" of the litigation. In *Haskins*, 558 P.2d at 495–96, this court stated that a "trial court's discretion is broad enough to warrant denial of attorney's fees altogether" under Civil Rule 82. Given the trial court's sound conclusion that each side should bear its own costs since each side prevailed in substantial areas of this litigation, we find this was an appropriate exercise of the trial court's discretion and affirm the decision to deny an award of costs and attorney's fees to either side.

### III.

In conclusion, we affirm the trial court's decision on all issues except the award for intentional interference with prospective economic advantage which is reversed for lack of sufficient evidence.

AFFIRMED in part, REVERSED in part, and REMANDED for entry of an amended judgment consistent with this opinion.

---

**16.** *See Hughes v. Nashua Mfg. Co.*, 257 Cal. App.2d 778, 65 Cal.Rptr. 380, 385 (1968); *Hoppin v. Long*, 74 Mont. 558, 241 P. 636, 644 (1925).